Curtis **PAYNE**, Plaintiff,

v.

**FORD MOTOR COMPANY**, a corporation, Defendant.

No. 71 C 175(3).

United States District Court, E. D. Missouri, E. D.

Sept. 12, 1974.

Samuel H. Liberman, Liberman & Baron, St. Louis, Mo., for plaintiff.

John R. Musgrave, Coburn, Croft, Shepherd & Herzog, St. Louis, Mo., for defendant.

MEMORANDUM

WANGELIN, District Judge.

This matter is before the Court for decision on the merits following the trial to the Court sitting without a jury.

Plaintiff, Curtis Payne, (herein Payne) brought this action alleging that defendant, Ford Motor Company, (herein Ford) engaged in certain discriminatory activities which were based on race and which were in violation of Title VII of the Civil Rights Acts of 1964, which is codified at 42 U.S.C. § 2000e et seq. Payne seeks recovery on the basis that Ford's disqualification of him from a certain position was based on racial grounds and that whites in similar cir-

cumstances were not disqualified. Plaintiff prays for relief in the form of payment of lost wages, reinstatement in his earlier position, damages for physical injury as a result of such alleged discrimination and punitive damages.

The Court being fully apprised of the premises hereby makes the following findings of fact and conclusions of law.

### Findings of Fact

1. This Court has jurisdiction over the subject matter of this suit and the parties hereto pursuant to 42 U.S.C., § 2000a-6.

2. Plaintiff, Curtis Payne, is a black man who was first employed by defendant, Ford Motor Company, at its Lincoln-Mercury plant in St. Louis, Missouri, on March 21, 1966, in the paint department as a metal painter.

3. Some time prior to May 15, 1967, a job opening in a Parts Control and Vehicle Scheduling Department with a job classification of Stock Status Control and Follow-up was posted. Payne applied for said position, took and passed the test and based upon seniority was given the position within the Parts Control and Vehicle Scheduling Department. On May 15, 1967, he was transferred to that department.

4. Parts Control and Vehicle Scheduling Department is made up of three sections known as, (1) Spec and Audit, (2) Parts Control, and (3) Cycle Checking. Payne was assigned to the Spec and Audit section under the general supervision of its supervisor, Eugene Brink, and the direct supervision of Jack Hagen, the Senior Auditor of Data Processing whose job was to teach Payne the job.

5. There was only one other employee of Ford with the job classification of Stock Status Control and Follow-up who did the same work that Payne did at all times and he worked under the supervision of Messrs. Brink and Hagen.

6. The responsibility of the Spec and Audit section was to prepare documents to be sent to key-punch operators to enable them to place information from those documents into a computer. This information was with regard to changes or modifications made to existing parts or new parts used in the assembly of the automobiles, including information as to the manner in which parts were used or the amount on hand. Spec and Audit obtained their information to accomplish this task from 8 x 11 sheets of paper called, "Spec Sheets" which were sent to them from the main office in Detroit, Michigan. It was Payne's job to interpret these "Spec Sheets" and place on certain documents, to be forwarded to the key-punch operators, the necessary information for input into the computer. This job was taught to Payne in an on-the-job training method by Mr. Hagen who has had much experience in this department. This was the same manner in which the job was taught to employees who were white. Payne was given the same, if not more help, attention and patience than any whites that held that same job.

7. Mr. Payne's initial work in this position was outstanding in terms of quality. Thereafter, according to credible evidence, his work became extremely low in volume and was replete with errors which bore no relationship to the degree of difficulty of the work which was being performed. These errors made by Payne were of a disproportionately larger quantity and severity than those of any other employees doing the same or similar work.

8. This pattern of error on the part of the plaintiff continued despite discussions about the quantity and quality of Payne's work with his supervisors. The evidence is clear that Payne routinely replied when confronted with evidence of these errors that he had not been taught that particular job routine before, even though he had done such work before.

9. As a result of these errors, Payne was penalized for poor and careless workmanship on August 18, 1967, at which time he was shown examples of such errors. The pattern of errors continued and plaintiff was again penalized for poor and careless workmanship on

December 4th and December 10th, 1967. Payne was not thereafter again penalized for poor and careless workmanship while he was employed in the Parts Control and Vehicle Scheduling Department.

10. In an effort to show Payne that he had done the work before and as an attempt to improve his attitude and work, his supervisor, Mr. Brink, kept samples of his erroneous work in a file. The evidence adduced at trial shows that this action on the part of Mr. Brink was in no way racially motivated and was at all times used in a beneficial manner towards the plaintiff. No documentation in this file with regard to errors or workmanship was used in any manner to penalize the plaintiff subsequent to the December 10, 1967 penalty, although it contained examples of his work through the middle of 1968.

11. One of the documents that Payne worked with, and upon which he placed information obtained from the Spec Sheets was called a "30 card". Upon return from the key-punch operator, the "30 cards" were filed in boxes in Payne's office. The Spec Sheets, after being interpreted and worked upon, were also filed in hard-back ring notebooks along a wall in Payne's office. This filing work in both instances was normally done standing up if only a few cards or sheets were to be filed in separate books, but had been done sitting down at a desk when a large amount of filing in a specific book or a specific box was to be done.

12. On February 23, 1968, Payne was seated at his desk filing, in an unnecessarily slow and dilatory manner, an amount of cards that were normally filed standing up. He was told to stand by his supervisor, but refused stating it was more comfortable to sit. For this action he was penalized for failure to follow instructions. On April 28, 1968 Payne was again seated at his desk filing sheets in a manner similar to the incident discussed above. Once again he was told by his supervisor to stand and file the Spec Sheets, which he then did. Thereafter all employees were made to stand for a short period of time to file sheets regardless of how many they had, which they did until the order was withdrawn, whereupon the prior method of filing Spec Sheets was again utilized, to-wit: standing or sitting depending upon the amount. In both instances, Payne resumed the practice of standing or sitting to file cards and sheets after each incident depending upon the situation.

13. Some time prior to August 1, 1968 Payne requested a day off to attend the funeral of his uncle in Chicago, Illinois, which request was granted by his supervisor, Mr. Brink. The requested absence for the funeral was not covered by the Union Contract, but was discretionary with his supervisor. Upon arriving in Chicago, Mr. Payne found that he would have to stay over until Monday to clear up some insurance claims involving his uncle's estate, of which he was apparently the beneficiary. He had not received permission in advance to be absent that Monday. Upon return to work on Tuesday, August 5, 1968, he was penalized for being absent without authorization on August 4, 1968. The evidence was quite credible that this action was in no way based upon Mr. Payne's race and that whites had been similarly penalized for such unauthorized absences by the defendant.

14. As a result of Payne's discussion with his Union Committeeman, Mr. Donovan, complaining about his ability to get along with Messrs. Hagen and Brink, Mr. Donovan requested in October of 1969 that Payne be transferred to the Parts Control section under the supervision of Mr. Lauder. This request was granted and on October 20, 1969 Payne started working for Mr. Lauder in Parts Control.

15. Prior to this transfer, Payne was aware of the nature of the work in Parts Control as that section worked in the same office as the Spec and Audit section, and Parts Control utilized the documents produced by Spec and Audit to perform their assigned tasks.

16. The responsibility of Parts Control was to keep track of the actual

amount of materials on hand and when the amount started to get low, to make arrangements to obtain additional material and follow up to see that it was on its way and that it would arrive in time, and that it had actually arrived. Thereafter, they were responsible to see that the information received was made available to Spec and Audit for input and updating of the computer records.

17. The first day on the job in Parts Control, Payne was told by Mr. Lauder of the critical nature of the job and the importance of attendance and how continuity of attendance was vital to do the job properly. He was also informed that nonattendance could result in parts not being available and the assembly line being shut down.

18. Evidence was produced at trial which satisfied this Court of the very critical nature of the Parts Control Department in terms of the operation of the entire automotive assembly line of the defendant.

19. Payne was absent four of the first fourteen working days while he was employed in Parts Control. He was reminded by Mr. Lauder on various occasions of the importance of attendance and the critical nature of his job. This was also explained to him by Mr. Baniak who instructed him on the job.

20. Plaintiff's job in Parts Control as stated above was critical, and good attendance, whether excused or unexcused, was necessary for efficient operation, and to prevent a burden on the rest of the department and the possibility of a production shutdown. Plaintiff was aware of this critical factor and was told of this on many occasions.

21. As a result of his absences within the first fourteen days, Mr. Lauder spoke with Mr. Dowling, the head of Labor Relations for defendant Ford, and asked him to talk to the plaintiff. Payne was warned by Mr. Dowling on November 11 that his job was critical and that his absences, both excused and unexcused, were having an adverse effect on the ability of his section to get their prescribed work done, and that if his absenteeism did not greatly improve, he would be disqualified, whether absent for excused or unexcused reasons. The next day Payne was absent and on the 13th, he was disqualified and transferred to working on the assembly line.

22. Ford's policy with regard to disqualification from a critical job for absenteeism, whether excused or unexcused, was permissible under the Union Contract and uniformly applied to whites as well as blacks in the Parts Control and Vehicle Scheduling Department.

23. Ford's policy with regard to transfer upon disqualification was to transfer the employee to available work which is what was done with the plaintiff. The Union Contract permitted this and the evidence is quite clear that whites had similarly been transferred to available work and not necessarily to a lower or different job in the same department.

24. In 1969, the Union Contract between Ford and the United Auto Workers did not provide for breaks for nonproduction line employees such as Payne. However, it was the Company's policy to permit a 12 to 15 minutes break in the morning and afternoon, as long as the privilege was not abused.

25. On or about October 30, 1969, a complaint from the security department was lodged with Mr. Dowling about Mr. Payne taking his breaks in that area and bothering the employees who were working. Mr. Dowling talked with Mr. Payne's supervisor who instructed Mr. Payne not to take his break in unauthorized areas and reminded Payne that non-production line personnel were not authorized to take breaks.

26. Thereafter, Mr. Payne took his breaks, apparently alone, and sometimes left early at the end of the day as he had not taken his break earlier.

27. With regard to Payne's claim that he was not permitted to take the test for the post of inspector on May 31, 1969, the evidence shows to the Court that Payne made no such application and in fact no test was given on that day; the Court further finds that tests for the post of inspector were given in Jan-

uary and August of that year and were taken and passed by blacks whose work records were better than Payne's as to penalties and absenteeism. One of these blacks, was in fact, promoted to the post, the other not receiving the promotion because of his low seniority. No white with a job similar to Payne's took the test for the post of inspector in January or August of 1969.

### Conclusions of Law

This being a bench tried case, this Court is faced with the dual responsibility of assessing the credibility of the witnesses and evidence presented to it by both sides as well as deciding what the applicable law is in the present case.

■ In racial discrimination cases such as this one, the plaintiff must establish by a preponderance of credible evidence that acts complained of resulted from racial prejudice. Christian v. General Motors Corporation, 341 F.Supp. 1207 (E.D.Mo., 1972). It is this Court's carefully considered opinion that plaintiff has failed to carry his burden of proof in this instant case.

Throughout the trial of this case the Court noted that the majority of the evidence adduced was of a conflicting nature and it therefore became the task of this Court as trier of fact to determine which evidence should be given the most weight due to the credibility of that evidence as noted by this Court.

■ It is quite clear to this Court that plaintiff Payne was notified several times that the critical nature of his job classification and that regular attendance was necessary for him to retain the job. If for the sake of hypothesis, this Court disregards the unexcused absences of plaintiff Payne, the evidence is clear that, considering the critical nature of the job which was amply proven by defendant, that Payne was indeed absent a greater number of times than would be expected of one who had been notified of the critical nature of his job.

When Mr. Payne's unexcused absences are considered in light of the whole record, it is obvious to this Court that defendant Ford Motor Company was well within the reasonable limits of employer conduct when it disqualified the plaintiff on the basis of excess absenteeism. The overall tenor of the record indicates that had the plaintiff wished, his amount of absenteeism could have been restricted or greatly curtailed, and plaintiff would probably still be employed in the Parts Control and Vehicle Scheduling Department.

The character of the evidence in this trial which bears on the other alleged incidents of racial discrimination, namely the denial of breaks and the requirement by the defendant that the plaintiff stand while doing certain filing operations also bears mention. As trier of fact in this matter, this Court finds from the evidence submitted to it that the incidents of which Mr. Payne complains were a matter of a conflict of personalities rather than any overt or even unintentional racial discrimination. There are numerous instances in the evidence where Mr. Payne was corrected for matters and details of workmanship that any person would be corrected for and Mr. Payne appeared to consider all of these as direct evidence of racial discrimination. It is obvious to this Court that defendant and its agents were more than lenient in their attitudes towards plaintiff and that their actions were of a quite benign nature, and probably in fact resulted in a benign discrimination in that Payne was treated in a more lenient fashion due to the fact that he was black than he would have received if he was white. The fact that defendant chose to transfer Mr. Payne rather than disqualify him after there were numerous instances of Mr. Payne's poor workmanship and attitude is an indication to this Court that defendant, rather than acting in a discriminatory manner was giving plaintiff more than the usual benefit of the doubt than would have been given to any other employee.

The Court finds that the alleged incidents of discrimination charged by the plaintiff were a creation of the plaintiff's state of mind rather than any discrimination which defendant may have engaged in.

As to plaintiff's other alleged instances of discrimination concerning application for promotions or for higher paying jobs, this Court finds that plaintiff has produced no credible evidence concerning this discrimination, and that the evidence produced by defendant leaves no reasonable conclusion other than that such discrimination never existed.

In conclusion, it is the finding of this Court that in the present case plaintiff's evidence concerning the charges of discrimination is simply not credible, and Mr. Payne has failed to carry his burden of proof in this matter. Accordingly, judgment will be entered for the defendant.