Gregory HARPER, Alonzo Webber and Steven Wright, Plaintiffs,

v.

GODFREY COMPANY, et al., Defendants.

No. 88–C–71.

United States District Court, E.D. Wisconsin.

Nov. 23, 1993.

Angermeier & Rogers, Mark Rogers, Milwaukee, WI, for plaintiffs.

Michael, Best & Friedrich, Paul Prentiss and Scott Beightol, Milwaukee, WI, for defendants.

## DECISION AND ORDER

RANDA, District Judge.

This Title VII action was tried to the Court last April. The Court must issue formal Findings of Fact and Conclusions of Law based on those facts. Plaintiffs allege racial discrimination with regard to their placement on a seniority list and their temporary layoffs. The Court finds against the plaintiffs on their seniority list claims and for the plaintiffs on their layoff claims.

## FINDINGS OF FACT [1]

### I. THE GODFREY OPERATION

1. Godfrey Company ("Godfrey") is a wholesale food distributor and retailer. (Trial Trans. ("TT."), Vol. 2 at 196.) Godfrey supplies food and other products to 90 Sentry food stores located throughout Wisconsin, including 36 corporate stores owned by Godfrey itself. (TT., Vol. 2 at 196–98.) Godfrey also supplies products to various convenience stores and other smaller stores located throughout Wisconsin. (TT., Vol. 2 at 196–97.) Godfrey-owned facilities include the 36 corporate stores, a headquarters and large warehouse located in Waukesha, a Food-for-Less store in Kenosha, the Crestwood Bakery (which the Court believes is located in Milwaukee County) and the Hub City Distribution Center in Marshfield. (TT., Vol. 2 at 196–99.)

2. Godfrey employs a combined total of 4500–5000 workers at the foregoing facilities. (TT., Vol. 2 at 198–99.) 3300–3700 of these employees work at the 36 corporate stores (located predominantly in southeast Wisconsin but also in other surrounding areas), of which roughly 8.8% are minorities. (TT., Vol. 2 at 199, 204–05, 208.) 650 employees work at the Waukesha headquarters, of which roughly 3.5% are minorities. (TT., Vol. 2 at 199, 208.) 80–100 employees work at the Kenosha Food-for-Less store, of which almost 20% are minorities. (TT., Vol. 2 at 199, 208.) 270–330 employees work at Crestwood Bakery, of which 4.5% are minorities. (TT., Vol. 2 at 199, 208.) The remaining employees work at the Hub City Distribution Center (located in Wood County, Wisconsin), of which 0% are minorities. (TT., Vol. 2 at 199, 208.) [2]

3. This case focuses upon Godfrey's warehouse operation in Waukesha. The warehouse is 560,000 square feet in size and supplies all of the corporate stores in southeast-ern Wisconsin and the surrounding areas. (TT., Vol. 2 at 204–05, Vol. 3 at 13.) The warehouse employs roughly 150 warehousemen and 60 drivers, of which roughly 3.5% are minorities (again, current statistics which Godfrey believes have not changed significantly since 1985). (TT., Vol. 2 at 199–200, 208.) Roughly 62% of the warehousemen reside in Waukesha County, which has a minority workforce availability of three-tenths of one percent (.003) (current and 1989 figures). (TT., Vol. 2 at 215–18.) Roughly 22% of the warehousemen reside in Milwaukee County, which has a minority workforce availability of 13.5%. (Id.)

4. There are seven basic job positions in the warehouse. (TT., Vol. 3 at 76–79.) A "receiver" unloads incoming product off of trailer-trucks, stacks it on pallets in the staging area, checks the product in and labels the pallets. (Id.) A "hauler" operates a forklift and moves the pallets from the staging area to the reserve locations indicated on their respective labels. (Id.) A "let-down operator" also operates a forklift and moves product from the reserve areas to the picking slots as needed. (Id.) A "pick car operator" drives an electric car throughout the warehouse and selects specific products from the picking slots and places them on a mechanized conveyor belt system leading down to the front dock. (Id.) A "front dock" employee takes product off of the conveyor belts and stacks it on nearby pallets. (Id.) A "loader" uses an electric pallet jack to load these pallets onto trailers for shipment to the various stores. (Id.) Finally, an "order selector" drives an electric powered jack throughout the warehouse to select products for shipment that are not in the conveyor system. (Id.) Of these seven, the most desirable positions are loader, let-down operator, hauler and receiver. (Id.) Employees must bid for these positions based on seniority. (Id.)

---

1. Additional factual findings are made and referenced in the Court's conclusions of law, where appropriate, in order that they may be discussed in the context of the relevant legal principles.

2. Note that these are only current statistics. Neither party submitted statistics from 1985, but Godfrey was confident that the figures had not significantly increased or changed since then. (TT., Vol. 2 at 209–10.)

## II. THE PLAINTIFFS

5. Gregory Harper, Steven Wright [3] and Alonzo Webber are black residents of Milwaukee County. (TT., Vol. 1 at 27–28, 90, 143.) Harper and Wright grew up in Milwaukee and all three are high school graduates. (TT., Vol. 1 at 28, 90, 143; Ex. 37.) Webber served six (6) years in the United States Army and received an honorable discharge. (TT., Vol. 1 at 143.) All three were employed at the time of trial. Harper worked full-time as a custodian at the Milwaukee County Medical Complex and part-time as a salesman at a local retail clothing store. (TT., Vol. 1 at 28.) Wright worked full-time as a third-shift parking attendant and part-time as a painter. (TT., Vol. 1 at 90–91.) Webber worked full-time assembling control panels for a local company named Electech. (TT., Vol. 1 at 143–144.) All three plaintiffs were previously employed by Godfrey. Godfrey hired them in June of 1985 as replacements for striking warehousemen and drivers in Godfrey's Waukesha warehouse. (TT., Vol. 1 at 28–29, 91–92, 144–145.)

## III. THE 1985 STRIKE

6. Godfrey warehousemen and drivers are members of the Teamsters Union. (TT., Vol. 2 at 203–04.) Their employment with Godfrey is governed by a collective bargaining agreement between Godfrey and the Teamsters. (Id.) One such agreement was due to expire around the middle of 1985. Godfrey intended to seek wage concessions and higher productivity standards in the new agreement and therefore anticipated that the warehousemen would strike. (TT., Vol. 3 at 7–8.) Godfrey took a number of steps to prepare for that possibility. First, it increased security. Godfrey installed a chain link fence around the 100–acre lot surrounding its warehouse and headquarters. (TT., Vol. 3 at 8–9.) It contacted various security agencies to install security cameras at both its headquarters and the corporate Sentry stores. (Id.) It hired additional security personnel. (Id.) Second, Godfrey recruited a strike replacement work force, using hiring

methods quite different from those it typically used. (TT., Vol. 3 at 9–12.) Prior to the strike Godfrey hired informally, selecting from a pool of people—principally residents of Waukesha County—who personally came in to file applications on their own initiative or because they had learned of possible openings through friends employed at Godfrey. (TT., Vol. 2 at 113–14.) To obtain strike replacements, however, Godfrey sought formal referrals from a Milwaukee employment agency called the Personnel Pool. (TT., Vol. 2 at 112, 141–42, 162–63.) Harper, Wright and Webber were all hired through this agency. (TT., Vol. 1 at 29, 91, 144.) Godfrey also advertised in the Milwaukee Journal, the Milwaukee Sentinel and the Waukesha Freeman. (TT., Vol. 2 at 112, 141–42, 162–63.) This method of recruiting resulted in a warehouse work force with a significantly higher percentage of black employees (possibly in excess of 50%) than was obtained by the informal pre-strike method. (Id.)

7. Starting in late-March, 1985, Godfrey bussed hundreds of potential strike replacements, including the plaintiffs, to its Waukesha facilities on the weekends for formal warehouse training. (TT., Vol. 3 at 10–11, 79–80, 98.) The goal was to put a work force together that would be able to operate the warehouse in the event of a strike by the Teamsters. (TT., Vol. 3 at 98–99.) This was not an easy task. There was a heavy amount of turnover among the potential strike replacements during the weeks preceding the strike. (TT., Vol. 3 at 10–11, 98.) Because of the training sessions, supervisory personnel were often working seven days a week and the atmosphere in the warehouse was tense and hostile. (TT., Vol. 3 at 99.)

8. The strike began on June 27, 1985 and lasted for roughly six (6) weeks. (TT., Vol. 2 at 143, Vol. 3 at 11.) The strike was violent, the days were long and the situation at Godfrey chaotic. Once the violence began, turnover among the strike replacements increased. (TT., Vol. 3 at 14.) Some 150–200

---

**3.** Steven Wright's surname throughout the prior pleadings and proceedings in this matter has always been spelled W–R–I–G–H–T and pronounced accordingly. During trial, Wright declared his surname to be White, spelled W–H–I– T–E and pronounced accordingly. (TT., Vol. 1 at 90.) For purposes of consistency, White's counsel referred to him throughout the trial as Steven Wright and the Court will do the same herein.

new replacements had to be hired and trained during the course of the strike. (Id.) Management quickly gave up efforts to record the movement of strike replacements. (TT., Vol. 3 at 16.) Supervisors and other management personnel continued to work seven days a week, especially in the early days of the strike, and often for 12–18 hour shifts. (TT., Vol. 3 at 19–20.) Strikers harassed replacement employees and Sentry customers and damaged Godfrey property. (Exs. 233–236; TT., Vol. 3 at 22–24.) One replacement driver had his delivery halted when two strikers fired a gun into the air and threatened to kill him. (TT., Vol. 3 at 22–23.) Another driver narrowly escaped serious injury when a bullet shot through the rear window of his tractor and missed his head by roughly two feet. (TT., Vol. 3 at 25–26.) Cleaning agents were poured over a meat case at one Sentry store. (TT., Vol. 3 at 27.) Metal spikes were sprayed over parking lots, causing several flat tires. (Id.) One replacement driver was actually pulled from his vehicle and beaten. (TT., Vol. 3 at 28.) Supervisors received death threats and even their spouses were approached and threatened. (TT., Vol. 3 at 25, 81, 103.) The situation was made worse by the extreme summer heat and the lack of adequate ventilation in the warehouse. (TT., Vol. 3 at 17.)

## IV. THE CREATION OF A CASUAL WORK FORCE

9. The end of the strike in mid-August did not bring peace. Godfrey had negotiated the creation of a group of part-time workers called "casual employees", to be distinguished from Godfrey's full-time workers, or "regular employees". (TT., Vol. 3 at 35.) Under the new contract, casual employees would fill in for vacationing or sick regular employees, or would be scheduled in addition to the regular employees if the workload called for it. (Ex. 200 at 4.) Moreover, as new regulars were needed, they would be hired from the existing pool of casual employees based on seniority. (Id. at 5.) Godfrey recruited the original group of casuals from the pool of strike replacements existing at the end of the strike, offering jobs to the best replacements from a pool of 200–250. (TT., Vol. 3 at 35–37.) Harper, Wright and Webber were among those selected. The presence of former strike replacements as casuals created significant tension and hostility in the warehouse. The returning strikers were extremely hostile towards the casuals because, to use the terminology of the Teamsters, they were "scabs" who had threatened the strikers' jobs and undercut their negotiating position with the company. (TT., Vol. 3 at 84, 104–06.) In addition, although all casuals were verbally harassed and threatened, black casuals (including the plaintiffs) were the targets of racial slurs. (TT., Vol. 1 at 32–34, 57–58, 94–96, 146–47; TT., Vol. 3 at 86, 100–01, 116–17.)[4] Pallets stacked by casuals were often knocked over, breaking and spilling their contents onto the warehouse floor. (TT., Vol. 3 at 84–85.) Lunches and clothing belonging to casuals were stolen. (Id.) At one point, the returning strikers indicated to management that such actions would stop only if Godfrey got rid of the "scabs". (TT., Vol. 3 at 103–05.) When that tactic failed, strikers demanded that all regulars be assigned to first shift and all casuals to second shift. (Id.) When this latter request was granted it created resentment among the casuals, many of whom were forced to work nights and perform jobs less desirable than those they performed during the strike. (TT., Vol. 3 at 87–8, 103–05.) This harassment and hostility between strikers and strike replacements continues to this day. (TT., Vol. 1 at 32–34, 94–96, 146–47; TT., Vol. 3 at 86, 106.)

## V. PLAINTIFFS' CLAIMS

10. Plaintiffs worked as casual employees for roughly two years. Harper and Webber

---

4. The racial name-calling was apparently limited to the returning strikers and generally occurred outside the presence of management. (TT., Vol. 1 at 57–58, 162–63.) Wright claims that one of his supervisors, Ed Urban, called him a pimp and a dope dealer because he was dating a white woman. (TT., Vol. 1 at 94–95.) It is not clear, however, whether Wright was present when the comment was made or whether he was told of the comment by other workers, in which case it would be hearsay. (Id.) Moreover, Wright's demeanor on the stand, his somewhat dubious claim to have kept telephone logs of his attempts to obtain work from Godfrey (see fn. 23, infra), and the inconsistency between this claim and Harper and Webber's testimony makes the Court question Wright's credibility on the issue.

were terminated by Godfrey on April 14, 1987. (Revised Joint Final Pretrial Report, Stipulation 4.) Wright was terminated by Godfrey on November 16, 1987. (Id., Stipulation 5.) Plaintiffs have never alleged that their terminations were discriminatory. It is conclusively established that all three were terminated because they were consistently unavailable for work during the early or (in Wright's case) later months of 1987.[5] (Court's Order Dated May 20, 1993 at 11–17; Exs. 209–211.) Plaintiffs claim, however, that two discriminatory actions were taken against each of them over the course of their employment with Godfrey. First, plaintiffs claim that their placement in the bottom half of the original casual seniority list, along with 4 of the other 5 black casual employees on that list, discriminated against them on the basis of their race. Plaintiffs also claim that their subsequent "lay-off" for a period of roughly 12 weeks in early 1986 also discriminated against them on the basis of their race.

### A. Preparation of the Casual Seniority List

11. The new labor contract with the Teamsters called for the creation of a casual work force and for the creation of a casual seniority list. (Ex. 200 at 4–5.) The purpose of the casual work force was to fill temporary or permanent vacancies in the regular work force. (Id.; TT.; Vol. 2 at 152–153.) The sole purpose of the casual seniority list was to determine the order in which casual employees would become regular employees.[6] (Id.; TT., Vol. 2 at 156; App. at IV; LeClaire Dep. at 29.) Thus, at the end of the strike, there were two tasks to perform: (1) Determine which strike replacements would be kept as casuals; and (2) determine an order of seniority among those strike replacements for promotion to regular status.

12. James LeClaire, then a first shift supervisor, performed both of the foregoing tasks pursuant to directions and instructions received from Douglas Barth, the general supervisor in charge of the entire warehouse and trucking operations.[7] (App. at I–II, V–VI; LeClaire Dep. at 4–6, 29–32, 35–38; TT., Vol. 2 at 156–60.) Barth assigned both tasks to LeClaire at the same time, which would have been sometime in August, 1985. (TT., Vol. 2 at 158–60; App. at V–VI; LeClaire Dep. at 30, 36–37.)[8] Regarding who to keep, Barth told LeClaire to choose the most qualified people based on knowledge, performance and attendance. (TT., Vol. 2 at 159; App. at VII; LeClaire Dep. at 39–40.) Regarding the order of seniority, the only instruction Barth gave LeClaire was to put all of the

---

**5.** This is not to say that plaintiffs conceded this point. In fact, plaintiffs have contested the issue throughout these proceedings. However, state unemployment compensation tribunals previously decided the issue against the plaintiffs and this Court ruled that the factual determinations contained in those decisions are collateral estoppel in this litigation. (Court's Order Dated May 20, 1993 at 11–17.)

**6.** The plaintiffs obtained a copy of this contract and read the same within weeks or, at the very most, within months after the strike. (TT., Vol. 1 at 31, 51–55, 146.)

**7.** LeClaire's whereabouts are unknown, but the parties submitted a transcript of his deposition to the Court and read in portions thereof during trial. The Court will therefore document LeClaire's testimony with cites to his deposition transcript. The Court also reprints critical portions of his testimony in the attached appendix and cites to those sections for easy reference.

**8.** This fact becomes important (see fn. 29, *infra*) and the evidence on the issue is somewhat contradictory. Barth clearly testified at trial that he gave both assignments to LeClaire at the same time. (TT., Vol. 2 at 158–59.) LeClaire testified that, although Barth told him to prepare a list of which strike replacements to keep, he did not recall Barth also telling him to prepare the list in some kind of order. (App. at VI; LeClaire Dep. at 36–37.) The Court finds Barth's testimony to be more accurate on this point. Barth specifically recalled telling LeClaire in August of 1985 to put the teachers and students who had worked for Godfrey during previous summers ahead of the strike replacements on the casual seniority list. (TT., Vol. 2 at 156–57.) While LeClaire was not certain if any of the casual seniority lists produced by Godfrey during this action was his original list, he did say that the first list he prepared was handwritten. (LeClaire Dep. at 32–33, 61.) The only handwritten list containing LeClaire's handwriting is Exhibit 19 (except for Exhibit 26, which LeClaire did not prepare until 1987). (Id.) Exhibit 19 places all of the teachers and students at the top of the list, consistent with Barth's instructions and testimony. (Ex. 19.) Thus, if Exhibit 19 was the first list (and it is the only list produced during the trial that could have been the first list), Barth's recollection must be correct. (Ex. 19; TT., Vol. 2 at 156–57.)

teachers and students who had worked for Godfrey during previous summers at the top of the list. (TT., Vol. 2 at 156–57, Vol. 3 at 110–12.) Barth gave no instructions as to how to order the seniority of the strike replacements, because they were all treated as being hired the same day. (Id.)

13. Out of 35 [9] strike replacements hired as casuals after the strike, seven of the eight black casuals (including the plaintiffs) were placed in the bottom half of the list and the other black casual was placed last in the top half of the list. (Exs. 19, 23, 204.) Plaintiffs were the last three black casuals on the list and three of the last four minorities on the list. (Id.) Webber was 25th on the list, Harper was 29th and Wright was 34th. (Id.) All three saw the list and their placement on it before they filed their EEOC complaints. (TT., Vol. 1 at 59, 64–65, 109–111, 127, 159–161, 169–171.) Wright only got a short glance at it and did not learn that it was a seniority list until later, when his lawyer told him so. (TT., Vol. 1 at 109–111.) Webber thought "[i]t was just a name on a list" and paid little attention to the list when he first saw it. (TT., Vol. 1 at 169–171.) He did not become concerned about his placement on the list until his lawyer explained it to him sometime in 1986. (TT., Vol. 1 at 160–161, 169–170.)

14. The parties dispute whether or not LeClaire offered an explanation for the ordering of the list, and if so, they dispute what that explanation was. As plaintiffs point out, there was some testimony and discussion concerning the possibility that the order of the list was based on the relative qualifications of each casual, the first on the list being the most qualified and the last on the list being the least qualified. (TT., Vol. 3 at 108–112; App. at V–VII.) However, the Court does not consider this explanation a serious possibility and neither do the parties.[10] The

---

**9.** The parties dispute whether the original casual seniority list retained 34 or 35 strike replacements. The issue turns upon whether a white casual named Dick Neibauer was a strike replacement retained after the strike or a new casual hired after the strike. Two handwritten versions of the casual seniority list (including Exhibit 19, which is probably the original seniority list) include Neibauer as the 35th strike replacement retained. (Exs. 19 and 204; TT. Vol. 2 at 132–35, Vol. 3 at 28–30.) Three other versions do not list Neibauer at all. (Exs. 20–22.) Neibauer himself did not testify, either in person or by way of deposition. Douglas Finkelmeyer, current Vice-President of Human Resources, reviewed Neibauer's personnel file (maintained during the regular course of business) and determined that Neibauer was a strike replacement hired the day after the strike began and terminated June 7, 1986. (TT., Vol. 2 at 132–35, 191–92.) Employment records submitted by the plaintiffs confirm that Neibauer worked hours both before and after the strike ended and also confirm that he was hired as a casual on August 18, 1985, the starting date listed for all strike replacement casuals. (Exs. 34, 35.) Plaintiffs' only rebuttal of the foregoing evidence is their contention that the "official" seniority lists were typewritten and contained the heading "Casual Seniority List". (TT., Vol. 2 at 136–39, 167.) These "official" lists do not include Neibauer, plaintiffs argue, and therefore Neibauer was not one of the original casuals. (Id.) Whether or not such lists were "official" does not answer the question of when Neibauer was hired and terminated. Even "official" lists may be mistaken. The best proof on the issue are the employment records which, according to Finkelmeyer's testimony and plaintiffs' own exhibits, clearly show that Neibauer was hired before the strike ended and terminated well after.

**10.** Godfrey claims LeClaire never consciously considered the order of the casuals. (Godfrey's Post Trial Memorandum at 17–21.) Plaintiffs suggest that an ordering based on ability was only mentioned as a "possibility" by LeClaire and should not be accepted by the Court. (Plaintiffs' Closing Argument at 5.) Although Barth stated at trial that, if asked, he would have told LeClaire to put the most qualified people at the top of the list, and that he assumes his supervisors would have known to do so, the fact of the matter is that Barth gave no such instructions. (TT., Vol. 2 at 156–57, Vol. 3 at 108–12.) And even though portions of LeClaire's deposition testimony could be read to support Barth's assumption, this is best explained by LeClaire's tendency, despite both counsel's efforts, to conceptualize the compilation of the list and the ordering thereof as one and the same thing. (App. at V, VIII.) This view of LeClaire's testimony is also supported by the testimony of Jim Mages, a Godfrey supervisor who participated in a meeting with LeClaire concerning the creation of the original casual seniority list. (App. at VI; LeClaire Dep. at 36–38.) Mages stated that the qualifications of the respective replacements was discussed only with respect to the question of who to keep and that there was no discussion regarding the order of seniority among those favored replacements. (TT., Vol. 2 at 165–67.) Nor would such hairsplitting seem likely under the circumstances. Both Godfrey and LeClaire emphasize the violent and stressful post-strike atmosphere in order to highlight the "helter-

better reading of LeClaire's deposition is the one posited by Godfrey. Godfrey suggests that LeClaire tried to explain that when he performed the first task of choosing which strike replacements to keep (in or around August, 1985), he wrote their names down on a sheet of paper in the order in which his supervisors randomly named their best and most reliable workers. (Godfrey Post Trial Memorandum at 17–21.) When the Union subsequently made a request for a formal seniority list (in or around November, 1985), LeClaire simply handed over the list he had already prepared, and the order on that list became the order of seniority.[11] (Id.)

15. In an attempt to discredit Godfrey's random hypothesis, plaintiffs submitted the testimony of Dr. Jack Stebbins, an expert in data analysis. (TT., Vol. 2 at 4–21.) Dr. Stebbins opined that the ordering of the list was not random. (TT., Vol. 2 at 9.) He performed three chi-square analyses of the data, assuming an original pool of 34 casuals and separating them into groups of black and non-black, white and non-white, and white and black. (TT., Vol. 2 at 9–15; Ex. 44.) He determined that the chances of the ordering being random under these breakdowns were less than 1% (.002678), less than 3% (.0278), and less than 1% (.0032628), respectively. (TT., Vol. 2 at 12–15; Ex. 44 at Cases 1, 1A and 1B.) Stebbins also performed three alternative tests on the data, known as the Kruskal–Wallis variance test, the median test, and the Mann–Whitney Wilcoxon rank sum test. (TT., Vol. 2 at 16; Ex. 44.) He determined that the chances of the ordering being random under these tests were more than 4% (.0424), less than 1% (.0047), and more than 4% (.0424), respectively.[12] (TT., Vol. 2 at 16; Ex. 44.)

## B. The 1986 Temporary Layoff

16. During the strike, Harper and Webber worked on or with the forklifts. (TT., Vol. 1 at 29, 145.) Wright worked in the freezer. (TT., Vol. 1 at 92–93.) After the strike, Harper and Webber were moved to the front dock. (TT., Vol. 1 at 35, 147–48.) Wright remained in the freezer for a couple of months, but was eventually moved to the front dock as well.[13] (TT., Vol. 1 at 93, 100.)

skelter" manner in which the original list was created, presumably to diffuse the notion that Godfrey had the time or desire to worry about such trivial matters as an employee's race. (Godfrey Memorandum at 17–21; App. at VII; LeClaire Dep. at 40.) For the same reason, it is doubtful that LeClaire and his supervisors would have taken the time and effort to rank (much like college football teams) the 35 casual employees that were kept. These 35 employees had already been singled out from a pool of 200–250 as being the best and most reliable strike replacements. Distinguishing between them further, under such hectic and trying circumstances, is not a likely possibility.

11. Substantial portions of LeClaire's deposition testimony demonstrate his attempts to communicate, however unartfully, this explanation for the ordering of the list. (App. at V, VII–VIII; LeClaire Dep. at 29–32, 38–41, 57–59.) Although LeClaire stated in other portions of his testimony that he could not recall how the order was established, the Court interprets this as a layman's way of saying, "Look, this happened a long time ago, I don't recall it perfectly, but I think this is what happened." (App. at VI–VII; LeClaire Dep. at 35–41.) Certainly it should not be interpreted, as plaintiffs suggest, to mean that LeClaire offered no explanation whatsoever for the ordering of the list.

The only "problem" with this finding is Finkelmeyer's testimony that there were two separate rounds of cuts made to reduce the number of casuals to 35. (TT., Vol. 3 at 34–37.) The timing of these cuts implies that the "original" seniority list of 35 casuals was not prepared in August, as LeClaire and Godfrey claim, but at some later date closer to the time when the Union requested the official seniority list. But the important point of LeClaire's testimony is this: Whether there were two cuts or one cut, the *final* cut was made in the manner described and prior to the Union requesting a formal seniority list. Nothing in Finkelmeyer's testimony contradicts this notion.

12. Dr. Stebbins performed other analyses as well. First, he opined that a random selection could well explain the cut from 87 casuals (25 of which were black) to 34 casuals (8 of which were black). (TT., Vol. 2 at 16–17; Ex. 44, Case II.) Second, he opined that the significant difference in the percentage of black casuals existing at the end of the strike (25/87) and the percentage of black casuals hired after the strike (1/59) was not random. (TT., Vol. 2 at 18–19; Ex. 44, Case IIIA.) Third, he opined that the significant difference between the percentage of black casuals existing after the cut to 34 (8/34)—(it was actually 35)—and the percentage of black casuals hired after the cut (1/59) was not random. (TT., Vol. 2 at 19–20; Ex. 44, Case IIIB.)

13. The front dock was apparently considered a less desirable job and many casuals complained about their reassignment there. (TT., Vol. 3 at

Plaintiffs were paid $9.25 an hour in these various positions and had no fringe benefits. (TT., Vol. 1 at 34, 97, 148–49.) Harper worked consistently from the end of the strike in August of 1985 until early-March, 1986. His average hours always exceeded 30 per week and he did not drop below that amount until February or March of 1986, when his average hours fell to 22.5.[14] (Ex. 35.) This decrease is consistent with Godfrey's claim that the demand for casuals was decreasing at or around this time. (TT., Vol. 2 at 153–155; Vol. 3 at 37, 107–108.) Webber worked less consistently, missing a little more than one month's work due to his incarceration on a traffic offense.[15] (Ex. 35 and TT., Vol. 1 at 149, 163–64.) Wright was the least consistent, averaging substantially less hours per week then Harper and Webber for most of 1985, and missing roughly 5–6 weeks of work in 1986 due to an injury.[16] (Ex. 35 and TT., Vol. 1 at 97.)

17. Both during the strike and for several months thereafter, Harper and Webber re-

ceived notice of their hours for any given week by means of a written schedule posted the week beforehand. (TT., Vol. 1 at 30, 34, 145, 148, 150.) They were not required to call-in for work, nor were they called-in by the company. (Id.) When Wright was working in the freezer, there was neither a written schedule nor a call-in procedure because there was only a certain crew that worked in the freezer and they had to be there five days a week at the same time.[17] (TT., Vol. 1 at 92, 96.) Thus, during those periods when the demand for casuals was high, casuals worked almost full-time and generally received their hours by means of a written or standing schedule. No call-in procedure was necessary or utilized. When the demand for casuals decreased (usually after the first of the year), there was not enough work for the casuals and some form of call-in procedure was utilized.[18]

18. The plaintiffs missed roughly 12 weeks of work beginning in late-February or early-March, 1986.[19] They were told that

---

87–8.) There is no evidence, however, that these plaintiffs ever complained about their reassignments.

14. Harper averaged roughly 40.5 hours per week in September of 1985, 38.25 hours in October, 31.4 hours in November, 32.50 hours in December and 32.50 hours in January of 1986. (Ex. 35.)

15. Webber lost his license as a result of that offense and had to ride in to work with Harper from that point on. (TT., Vol. 1 at 163–64.) Prior to the offense, Webber worked fairly consistently, averaging roughly 38.475 hours per week in September of 1985, 38.225 hours in October and 27.8 hours in November. (Ex. 35.) After his incarceration, Webber returned to work, averaging roughly 22.76 hours per week in January of 1986 and 24.5 hours in February. (Id.)

16. Wright averaged roughly 37.225 hours per week in September of 1985, 29.125 hours in October, 16.2 hours in November and 21.325 hours in December. (Ex. 35.) These hours sharply contradict Wright's claim that he "was working forty hours a week" after the strike. (TT., Vol. 1 at 96.) Wright also claimed that he worked overtime. (Id.) Records reflect, however, that he never worked more than 40 hours a week after the strike. (Ex. 35.) Wright worked only 1 day (8.7 hrs.) in January of 1986 before injuring himself and going on worker's compensation leave. (Ex. 35; TT., Vol. 1 at 97.) He was not able to work again until February 14, 1986

(Revised Joint Final Pretrial Report, Stipulation 6), but he was told at that time that he was laid-off. (TT., Vol. 1 at 97.)

17. Wright also testified, however, that he remembered someone telling him about a call-in procedure for casuals immediately after the end of the strike. (TT., Vol. 1 at 131.) Whether or not such a procedure was mentioned to him, it clearly was not observed by the casuals or Godfrey during periods of high demand for casuals.

18. This is consistent with the findings of the state unemployment compensation tribunals, which found that although a formal call-in procedure was announced for all casuals in a letter dated April 28, 1986, "the employe [sic] was never required to utilize this procedure, since he worked full-time from shortly after his receipt of the instructions, to his separation from the workplace in January of 1987." (Exs. 209–211.) It is also consistent with the testimony of Godfrey's supervisors. The only comments any of them made regarding the existence of a call-in procedure was in reference to the seasonal slowdowns that typically occurred after the first of the year. (LeClaire Dep. at 27; Barth Testimony, TT., Vol. 2 at 153–155.)

19. The length of the absence is not disputed. Harper and Webber claim their last day of work was on or around February 28, 1986. (TT., Vol. 1 at 36, 149.) Company records show that Harper and Webber actually worked through week 10 of 1986, which by the Court's calculations

they were laid-off because of a slowdown in work for casuals [20] and that some form of call-in procedure would be used during the layoff.[21] Shortly thereafter, however, plaintiffs returned to the warehouse and saw new white casuals performing their jobs on the front dock. (TT., Vol. 1 at 38, 100, 151.) Company records in fact indicate that 5 white casuals were hired during the months of January–March, 1986. (Ex. 204.) Jim Hagedorn, one of those new white casuals hired in early February, worked consistently for several months thereafter, was put "on-call" only a few times, and even during those periods was called-in every day. (TT., Vol. 2 at 45.) He and two of the other new white casuals, Ken Busalacchi and Jim Himmelstein, averaged roughly 39.5, 44.5 and 39.5 hours a week (respectively) during the so-called "layoff". (Exs. 35, 36.) The average hours-per-week for all of the 28 casuals who worked more than two weeks during that period (all but two of whom were white) was almost 38 hours. (Ex. 36; TT., Vol. 2 at 102–104.) Plaintiffs received no hours at all during this same timeframe. (Exs. 35, 36.) In fact, prior to the "layoff" white casuals averaged 32–40 hours per week, while Harper and Webber averaged 18–37 hours [22]; during the "layoff", plaintiffs received no hours, while white casuals continued to average 32–40 hours per week. (Exs. 13–15.)

19. The call-in procedure utilized during the "layoff" was for Godfrey to call individual casuals one-by-one until the need for casuals (if any) on a given day was met.[23] While

[ended on or around March 11, 1986. (Exs. 34, 35.) Harper and Webber further testified that they started back to work sometime the last week of May, 1986, which by the Court's calculations was week 22 of 1986. (TT., Vol. 1 at 41, 154.) This testimony was uncontradicted. Thus, even assuming the layoff began in week 10, the record substantiates a 12 week absence. Wright was on worker's compensation prior to the alleged layoff, so there are no similar records for him, but his testimony was that he also missed roughly 12 weeks of work. (TT., Vol. 2 at 103.) Godfrey does not dispute or rebut any of these figures and in fact uses them as a basis for its own damages analysis. (Defendant's Post Trial Memorandum at 21.)]

20. All three plaintiffs testified that Ed Urban, a Godfrey supervisor, told them they were laid-off because there was little or no work for casuals. (TT., Vol. 1 at 36–37, 98–100, 150.) This was confirmed by Doug Barth, who testified in his deposition that, due to the decreased demand for casuals after the new year (caused by a corresponding decrease in the number of vacations taken by regular full-time employees), many casuals were laid-off or told there was no work. (TT., Vol. 2 at 152–155.) Ed Urban, the only person with personal knowledge that could possibly rebut this testimony, did not testify and apparently was not deposed by either party.

21. The form of the call-in procedure is a critical and disputed issue, however.

22. Wright was on worker's compensation during this period.

23. This point was hotly disputed. Godfrey claims that all casuals, including the plaintiffs, were told to call in weekly and/or daily to see if there was any work available. (Godfrey's Post Trial Memorandum at 10.) Harper and Webber claim that Urban said the company would call them when work became available and that he never said anything about a call-in procedure. (TT., Vol. 1 at 37, 150.) While the evidence does not clearly support either position, the Court finds that the preponderance of the evidence favors Harper and Webber's testimony. There was no one to actually rebut their testimony. Urban did not testify and no one else from Godfrey had personal knowledge of what Harper and Webber were told, or what any other specific casual was told for that matter. (TT., Vol. 2 at 155; Vol. 3 at 95.) Hagedorn, one of the new white casuals hired during the "layoff", said *the company called him* the few times he was actually put on-call. (TT., Vol. 2 at 45.) During a similar slowdown over the same period in 1987, the company called casuals on a daily basis and even kept track of the calls in a phone log. (Ex. 27; TT., Vol. 3 at 90–94.) The only documentary evidence of Godfrey's version of the call-in procedure were letters describing the same and dated April 28, 1986, but these letters were sent to the plaintiffs more than one month after they filed their EEOC charges and appear to announce or establish a call-in procedure, rather than reiterate an existing policy. (Exs. 10–12.) Barth stated generally at trial that the laid-off employees were told to call-in, but admitted that he made no mention of this fact during his prior deposition (where he confirmed that casuals were "laid-off") and further admitted that he has no idea whether these specific plaintiffs were told to call-in. (TT., Vol. 2 at 153–55.) Even the ERD, which found probable cause to believe plaintiffs were discriminated against, found that the procedure for returning to work was "not clear" and that Godfrey's submissions to the ERD were contradictory on the issue. (Exs. 13–15 at ¶ VII–L.)

The wrinkle in this conclusion is the fact that Wright testified that he was told by Urban to call in to see if work became available, similar to

Godfrey had problems finding casuals willing and able to work when called (TT., Vol. 3 at 91–92, 101), there are no documents or testimony directly showing that the plaintiffs were unavailable during the "layoff" period. (Godfrey's Post Trial Memorandum at 8.) None of Godfrey's witnesses had any knowledge whatsoever regarding plaintiffs' availability, either during the strike or before and during the "layoff". (LeClaire Dep. at 27–29; TT., Vol. 3 at 95.) Godfrey cannot provide any dates as to when the plaintiffs were called during the "layoff" or when they were not available. (Exs. 13–15, ¶ VII–L.) All three plaintiffs waited one month, however, before returning to work after receiving the April 28, 1986 letter from Godfrey telling them work was available. (Exs. 10–12; TT., Vol. 1 at 41, 106, 154.) Webber and Harper were also unavailable during a similar layoff or slowdown in February and March of 1987 and were terminated as a result of their unavailability.[24] (Exs. 209–210.) A work/phone log maintained in 1987 shows that Wright was often sick or unavailable during this same period. (Ex. 27; TT., Vol. 3 at 92–93.) Wright was subsequently terminated for his own inability and/or unavailability for work. (Ex. 211.)

## CONCLUSIONS OF LAW

### I. PLAINTIFFS' CASUAL SENIORITY LIST CLAIMS

1. There are two well-recognized theories of recovery under Title VII: Disparate treatment and disparate impact. "In a disparate treatment claim a plaintiff seeks to prove that an employer intentionally 'treats some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Segar v. Smith*, 738 F.2d 1249, 1265 (D.C.Cir.1984). Under this theory, "proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Sousa v. Hunter*, 739 F.Supp. 756, 759 (E.D.N.Y.1990). A disparate impact claim is premised on the existence and identification of "facially neutral employment practices that have significant adverse effects on protected groups...." *Watson v. Ft. Worth Bank and Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). "It is not necessary to prove discriminatory motive in order to establish a case of disparate impact." *Palmer v. Shultz*, 662 F.Supp. 1551, 1568 (D.D.C.1987). The theories are not mutually exclusive and "are rightly treated as alternative theories upon which a right to relief under Title VII may be established in a given case." *Wright v. National Archives & Records Service*, 609 F.2d 702, 711 (4th Cir.1979).

### A. Failure to Pursue Claim Before the EEOC

■ 2. Before addressing the merits of the seniority list claims, we consider a proce-

---

what he said he was told immediately after the strike. (TT., Vol. 1 at 97–98, 131.) Wright also claims that he called in everyday during the month of February (to no avail) and that he kept handwritten notes of every call. (TT., Vol. 1 at 97–98, 116.) But there is good reason to question Wright's motives and credibility here. He no longer has the handwritten notes, and the notes he produced at trial were typed by his sister because he "thought it would look better if they were typed". (TT., Vol. 1 at 116; Exs. 8, 9.) These typewritten versions are incomplete, as they do not have daily entries and have no entries at all for the month of March. (Exs. 8, 9.) Wright also cannot recall if the typewritten versions contain all of the information that was in his original notes. (TT., Vol. 1 at 119.) Moreover, Wright kept no notes of calls he allegedly made after receiving the letter from Godfrey instructing him as to the call-in procedure. (TT., Vol. 1 at 104, 117.) Wright's proffered explanation for not keeping notes of these calls is that he

had a lawyer involved at that point and he "thought she would direct me in the right way." (TT., Vol. 1 at 117.) But Wright also testified that his lawyer instructed him to continue making the calls and never instructed him to stop keeping notes of the same. (TT., Vol. 1 at 104, 117.) Why would Wright suddenly stop keeping a phone log which, according to his own testimony, he so diligently maintained before? And why would he do so after filing a claim that the company had discriminated against him by means of a bogus layoff? These contradictions and inconsistencies, combined with Wright's demeanor on the stand, causes the Court to dismiss Wright's testimony in this regard as lacking credibility.

24. As referenced earlier, these findings have already been made by a state unemployment compensation tribunal and those findings are collateral estoppel in this litigation. (Court's Order dated May 20, 1993 at 11–17.)

dural objection. Godfrey again raises the plaintiffs' admitted failure to raise and pursue the casual seniority list claim before the EEOC as a defense against the assertion of the claim in this action. This defense was first argued by Godfrey in a summary judgment motion filed and decided while the case was still pending before Judge Stadtmueller. As Judge Stadtmueller noted in his decision denying summary judgment, the fact that the EEOC investigation did not include Godfrey's preparation of the casual seniority list is not necessarily fatal to plaintiffs' claims. (March 15 Order at 16–17.) The question is what investigation could reasonably have been expected to grow from the allegations in the EEOC complaint. (Id.) Judge Stadtmueller held that a reasonable investigation could have grown to include the casual seniority list claim and this Court affirmed that holding in its previous decision on Godfrey's motion to reconsider. (May 20 Order at 4–5.) In so doing, the Court rejected the application of a proffered exception to the general rule stated by Judge Stadtmueller. The exception, discussed in *Witherspoon v. Roadway Express, Inc.*, 782 F.Supp. 567 (D.Kan. 1992), bars a plaintiff from bringing suit for discriminatory acts not reported to the EEOC (regardless of whether a reasonable investigation could have grown in scope to cover such claims) if those acts occurred prior to discriminatory acts that were reported to the EEOC. *Id.* at 571–72. In holding the exception inapplicable, the Court noted, among other things, the insufficiency of the factual record:

> But *Witherspoon* has no binding effect upon this Court. Moreover, the record at this point is unclear as to when the plaintiffs saw the casual seniority list for the first time, how much time they were afforded to analyze the list, and therefore whether they were aware of racial discrepancies therein at the time they filed their EEOC charges. For these reasons, and for reasons of comity, the Court will not reconsider Judge Stadtmueller's denial of summary judgment as to plaintiffs' Title VII claim.

(May 20 Order at 5.) Godfrey raises the issue yet again because during trial the plaintiffs "all acknowledged they had seen and they were aware of their location on the original casual seniority list in late 1985 *long before* they filed their temporary lay-off discrimination complaints with the Wisconsin Equal Rights Division in March, 1986." (Defendant's Post Trial Memorandum at 13.) This is true. (Finding of Fact ("FOF") 13.)

■■ 3. The principle stated in *Witherspoon* makes good sense and the Court hereby recognizes it as a valid exception to the general rule that an EEOC charge is read to include any claim which a reasonable investigation could have uncovered.

4. Whether or not the Court applies the principle here, however, turns upon whether the Court creates an exception based on "actual" or "constructive" knowledge of the prior claim. That is, the record is still unclear as to whether the plaintiffs had actual knowledge of racial discrepancies in the list and their significance before they filed their EEOC charges. (FOF 13.) An argument can be made, however, that the plaintiffs reasonably should have known of these discrepancies, *i.e.*, that they had constructive knowledge. Which standard the Court adopts should be based upon a consideration of the two competing policies involved in construing the proper scope of a Title VII complaint:

> The first is that Title VII is a broad remedial statute designed to protect those who are the least able to protect themselves. An individual who files a discrimination charge seldom has the assistance of counsel and is not expected to articulate the entire range of allegedly discriminatory practices of which he feels he is a victim. Courts, therefore, have given a liberal interpretation to allegations in discrimination charges in order to effectuate the underlying purposes of Title VII. The second policy is that Title VII plaintiffs should not have an unrestrained ability to litigate allegations of discrimination which are neither contained in the EEOC charge nor investigated by the EEOC, thereby frustrating the statutory scheme of informal persuasion and voluntary compliance. Without limitations, the importance of the EEOC conciliatory procedures would be diminished and employers would be denied the

opportunity to resolve disputes by EEOC settlement rather than by litigation.

*Hubbard v. Rubbermaid, Inc.,* 436 F.Supp. 1184, 1188–89 (D.Md.1977).

5. A standard of constructive knowledge is perfectly reasonable in light of the foregoing policies. If courts are going to grant plaintiffs reasonable post-filing expansions of their claims based on the remedial purposes of Title VII, it is only fair to require plaintiffs to be reasonably diligent in discovering their claims based on Title VII's professed goal of "voluntary" compliance. The former concession already represents a substantial departure from the general notion that "the filing of a discrimination charge with either a federal, state, or local agency is the essential first step in the administration of Title VII." *Id.* at 1187.

6. It is also reasonable to conclude that the plaintiffs should have been aware of the racial discrepancies in the list and their significance prior to filing their EEOC charges. They were each represented by counsel. They all saw the list and their placement on it well before the charges were filed. (FOF 13.) There were only 35 names on the list, so it could not have taken much time or difficulty to notice the racial breakdown. (Id.) And the purpose of the list was made clear in the labor contract, which plaintiffs obtained a copy of and read well before they filed their charges. (FOF 11, fn. 6.) Given these facts, which were not part of the record on Godfrey's prior motions, the Court reconsiders its prior decision and holds that plaintiffs' casual seniority list claims must be dismissed on jurisdictional grounds.[25] Because the matter has already gone to trial, however, the Court also considers the merits of the case and finds that these claims must be dismissed on substantive grounds as well.

### B. Disparate Treatment

#### 1. The relevant standard.

7. The parties devote much of their post-trial briefing to such matters as the prima facie case, the articulation of legitimate, non-discriminatory explanations, shifting burdens of proof and production and possible findings of pretext.[26] These efforts were wholly unnecessary. "Once the trial in a disparate treatment case is over, the question is whether the employer intentionally discriminated against the employee on account of race or another characteristic covered by the statute. The employee bears the burden on this subject, and the rules governing prima facie cases, order of proof, responses, and so on no longer matter." *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557,

---

25. Plaintiffs argue against dismissal on the grounds that the Court has already ruled against it twice and also on the grounds that, regardless of when the plaintiffs became aware of their placement on the list, they could not have been aware of any damage resulting from that placement until the first casual was hired as a regular in April of 1986. (Plaintiffs' Reply at 16–17.) The first argument is unpersuasive. This Court ruled as it did primarily because it did not have factual support for the conclusion Godfrey wished it to draw. Now it does. No Court should affirm the validity of an interlocutory decision when new facts, combined with sound policy, compel a contrary disposition. The second argument is simply incorrect. Plaintiffs could have and should have known the "damage" (if any) which the list would inflict on them as soon as they obtained a copy of the contract that told them what the list was going to be used for.

Plaintiffs' counsel also objected to this entire line of questioning during trial. He argued that he relied upon the Court's prior ruling against dismissal in deciding not to contact plaintiffs' former counsel to inquire as to why the claim was not expressly included in the EEOC charge, and that his clients were therefore prejudiced if the issue was still open to consideration. But the testimony of plaintiffs' former counsel would have been irrelevant to the question decided here. The issue is what the plaintiffs knew or should have known long before their attorney entered the picture. If they failed to discover or understand what they reasonably should have discovered or understood, or if they failed to inform their counsel of what they discovered, or even if their counsel decided not to pursue the matter further, the result is the same: The claim is dismissed.

26. The Court is well-acquainted with the evidentiary progression referenced by the parties. Generally, a plaintiff first makes out a prima facie case of discrimination, which is not onerous, and which may be rebutted by the employer producing some evidence of a legitimate, non-discriminatory reason for the decision at issue. *Watson,* 487 U.S. at 986, 108 S.Ct. at 2784. The plaintiff then tries to prove that the proffered explanation was a pretext and that the real explanation was race. *Id.*

558 (7th Cir.1987); *see also, Washington v. Electrical Joint Apprenticeship & Training Committee,* 845 F.2d 710, 713–14 (7th Cir. 1988). This is only appropriate, lest the rules and procedures intended to merely facilitate the presentation of evidence in Title VII cases become the sum and substance of the remedy itself:

> We have cautioned that these shifting burdens are meant only to aid courts and litigants in arranging the presentation of evidence: "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

*Watson,* 487 U.S. at 986, 108 S.Ct. at 2784.

> Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of (in the context of the present case) race.

*Saint Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2756, 125 L.Ed.2d 407 (1993).

### 2. Application of the standard.

■ 8. The bulk of plaintiffs' evidence that race was the determining factor in preparing the order of the casual seniority list is statistical. This came in through the testimony of Dr. Stebbins. As described earlier, he performed three variations of a chi-square analysis and one variation each of three alternative analyses on the original casual seniority list. (FOF 15.) These tests yielded statistical probabilities ranging between 4% and less than 1% that the order of the list was determined by chance. (Id.) Because the tests yielded probabilities below 5%, which is the maximum threshold for statistical significance, Dr. Stebbins concluded that the random hypothesis should be rejected. (Id.) The fact that plaintiffs' proof is largely statistical, however, does not necessarily betray a weakness in plaintiffs' case. "[C]ourts have inferred unlawful discrimination from

**27.** The 7th Circuit also recognizes 5% as the beginning point for statistical significance.

statistically significant disparities in the treatment of comparably situated protected and nonprotected groups." *Coates v. Johnson & Johnson,* 756 F.2d 524, 540 (7th Cir. 1985). The question is obviously one of degree:

> The notion of statistical significance addresses directly the question whether an inference of discrimination is warranted. Statistical significance is a measure of the probability that the outcome of a statistical analysis would have occurred by chance: The lower the probability that the observed outcome could have occurred by chance, the stronger the inference of discrimination that can be drawn.... Although the law has not set any precise level at which statistical significance can be said to be sufficient to permit an inference of discrimination, social scientists usually accept a study that achieves statistical significance at the .05 [5%] level. In other words, a study is found significant—and the hypothesis of chance is rejected—when there exists at most a one in 20 possibility that the observed result could have occurred by chance. Several courts have adopted the .05 level as sufficient to support an inference of discrimination in Title VII cases.

*Segar v. Smith,* 738 F.2d 1249, 1282 (D.C.Cir. 1984).[27] (Citations omitted.)

■ 9. The mere fact that Dr. Stebbins' analyses yield probability levels of statistical significance does not end the statistical or judicial inquiries. It is important to note that "[s]tatistics ... cannot entirely rule out the possibility that chance caused the disparity. Nor will they be reliable if not accurately drawn or focused on a proper labor pool." *Palmer v. Shultz,* 662 F.Supp. 1551, 1557 (D.D.C.1987). While statistics "can be of great assistance to the factfinder", they can also be "so manipulable that some skepticism may be justified when set in the evidentiary context of the whole case." *Coates,* 756 F.2d at 539. Statistics "come in infinite variety and ... their usefulness depends on all of the surrounding facts and circumstances." *In-*

*Coates,* 756 F.2d at 537, n. 13.

*ternational Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 1856–57, 52 L.Ed.2d 396 (1977). Thus, "[c]ourts should take a 'case-by-case approach' in judging the significance or substantiality of disparities, one that considers not only statistics but also all the surrounding facts and circumstances." *Waisome v. Port. Auth. of N.Y. & N.J.,* 948 F.2d 1370, 1376 (2d Cir.1991).

■ 10. The Court first notes the range of statistical probabilities that Dr. Stebbins analyses yielded. His three chi-square analyses yielded a probability range of 3% to less than 1%. (FOF 15.) Two of his three alternative analyses, however, yielded probability levels in excess of 4%, less than one percentage point short of the minimum threshold of 5%. (Id.) It becomes important, then, to determine which of these analyses is the most probative within the context of this case. The statistical analysis which more closely parallels the method of selection suggested by the physical evidence is the most probative statistical analysis. Here, Dr. Stebbins characterized the chi-square analysis as assuming that the top 17 casuals on the list were chosen at the same time in a single action. (TT., Vol. 2 at 24–25.) He analogized it to waving a paddle with 17 indentations through a jar of 34 balls, some white and some black, such that 17 balls would simultaneously be caught by the paddle (symbolizing the 17 casuals on the top half of the list) and 17 would roll off (symbolizing the 17—(it's actually 18)—casuals on the bottom half of the list). (Id.) This is not the method of selection posited by Godfrey and adopted by the Court. As explained earlier, the better reading of LeClaire's testimony is that he wrote the names down in the random order in which Godfrey supervisors named the best and most reliable casuals. (FOF 14.) This means the order of the list was determined one name at a time.[28] Dr. Stebbins himself testified that only his three alternative analyses factor the order of choice into the equation. (TT., Vol. 2 at 25–

26.) Thus, Dr. Stebbins' alternative analyses are the most probative with respect to the credibility of Godfrey's proffered explanation.

■ 11. Two of the alternative analyses yield probability levels in excess of 4%, which is so close to the minimum threshold of statistical significance that a minor variation upward could significantly alter the evidentiary value of the statistics (especially considering the relatively small labor pool at issue here). Here, the Court sees two possible variations which were not addressed in Dr. Stebbins' calculations. First, his calculations assumed the presence of only 34 casuals on the original list, while the better evidence indicates there were 35. (FOF 13, fn. 9.) The Court cannot be certain how this affects the calculations. Godfrey did not address the discrepancy at trial or in its post-trial brief. Plaintiffs argue that the discrepancy makes little difference. They point out that adding a 35th casual moves only one black casual into the top half of the list (its actually one-half of one black casual) and that Case 1A of Dr. Stebbins' chi-square analyses had the effect of moving *two* minority casuals (1 oriental and 1 hispanic) into the top half of the list and still showed a probability level of less than 3%. (Plaintiffs' Closing Argument at 10.) But while Case 1A increased the number of target casuals in the top half of the list from 0 to 2, it also increased the pool of target casuals from 8 to 11 (the difference between the number of blacks and the number of minorities generally), which might explain why the corresponding change in probability was small. Moreover, as stated above, Case 1A assumes a simultaneous method of selection for which there is no support in the record. There is no discussion as to how a 35th casual would affect the Kruskal–Wallis or Mann–Whitney Wilcoxon tests, both of which are more probative and both of which yielded probability levels slightly greater than 4%. (FOF 15.) Even Case 1A saw a two-and-one-half percentage point increase in probability levels from Case

**28.** Even if the Court finds, as plaintiffs argued, that LeClaire actually posited no explanation for how the list was ordered, such a finding does not support the notion that somehow the top 17 names were chosen simultaneously, as assumed

in Dr. Stebbins' chi-square analyses. Indeed, the very act of making a written list of names involves writing each name down separately and one at a time.

1. (Ex. 44.) A similar increase, or even one-half thereof, in the Kruskal–Wallis or Mann–Whitney Wilcoxon tests would put the plaintiffs over the minimum threshold of statistical significance.

12. There is a second variation that was not addressed in Dr. Stebbins' analyses. Dr. Stebbins assumed that the order of the casual seniority list was determined independently from, and subsequent to, the compilation of the list. Thus, the analyses tell us the statistical probability that the order of the casuals was determined by randomly selecting names from the pool of 34 casuals (it was actually 35) previously determined to be the most reliable. But that is not how LeClaire described what took place. LeClaire claimed he unconsciously ordered the list at the same time as he compiled the list, simply by writing names down in the order in which they were given to him by Godfrey supervisors as they randomly named their best and most reliable casuals. (FOF 14.) Thus, the names were chosen and ordered from a pool of 87 casuals, not 34 or 35.

13. The Court does not presume to offer the foregoing variations as "errors" in Dr. Stebbins' calculations requiring the outright rejection of his opinions, nor would it be appropriate or necessary to do so. The Court simply offers these variations as considerations which properly affect the weight to be given to Dr. Stebbins' conclusions. Based on these considerations, it remains statistically unclear whether or not Godfrey's random hypothesis can or should be rejected. This said, the Court must consider whatever additional evidence of discrimination is posited.

■ 14. Plaintiffs again point to Dr. Stebbins. He testified that the significant difference in the percentage of black casuals existing after the strike (25/87) and the percentage existing after the final cut (8/34), as compared to the percentage of black casuals hired after the final cut (1/59), could not be randomly explained. (FOF 15, fn. 12.) But these opinions tell us little. Godfrey has not argued that the significant differences referenced above were randomly created. Finkelmeyer admitted that the differences were the result of returning to Godfrey's pre-strike method of hiring, which relied primarily on hiring people off the street, principally residents of Waukesha County, who personally came in to file applications on their own initiative or because they had learned of possible openings through friends employed at Godfrey. (TT., Vol. 2 at 112–116.) Less than 2% of the casuals hired using this method were black. (Id.) This is not surprising, because the percentage of blacks hired by this method ought to generally reflect the percentage of available black workers in Waukesha County, which is less than 1%. (FOF 3.) The Court infers no racist intent from Godfrey's sensible decision to return to its normal method of hiring once the crisis at hand had passed. Godfrey is not required to hire individuals from other communities simply because Waukesha County has a low percentage of black residents.

■ 15. Dr. Stebbins also testified that, based on his statistical analyses, and if no other explanation was offered, he would conclude that race was the determining factor in the ordering of the list. (TT., Vol. 2 at 12–13.) Such an opinion, however, is clearly outside the realm of his scientific expertise. Dr. Stebbins is a mathematician. Mathematical principles allow him to determine the statistical probability that a given distribution or event occurred by chance. Mathematical principles do not, however, allow him to speculate as to the actual subjective motives of a given person at a given time. Indeed, in rendering this opinion, Dr. Stebbins appears to employ a double standard in favor of the plaintiffs. When he had to admit that the random hypothesis for the racial percentages involved in the reduction from 87 casuals to 34 could not be negated, he expressly refused to go further and say that race could affirmatively be ruled out. (TT., Vol. 2 at 17–18.) On the flip side, where he concludes that the random hypothesis can be negated, Dr. Stebbins is willing to go further and affirmatively rule race in. He cannot have it both ways. The only "expert" opinions Dr. Stebbins can offer are those relating to statistical probabilities. His opinion regarding LeClaire's subjective motivations is a "lay" opinion at best and one entitled to little credence due to its inconsistent application.

16. Finally, plaintiffs point to various other indicia of discrimination which the Court finds unpersuasive. First, plaintiffs argue that Exhibit 19, which appears to be the original handwritten list prepared by LeClaire, "visually bespeaks some effort at ordering", insofar as the names of the white casuals above Larry Spencer (the first black casual) appear to have been squeezed in. (Ex. 19; Plaintiffs' Closing Argument at 11.) While the Court acknowledges that the names above Larry Spencer are written in smaller print and closer together than the names below Larry Spencer, there could be any number of explanations for this phenomenon. Unfortunately, the plaintiffs did not ask LeClaire for an explanation during his deposition. Second, plaintiffs argue that the Court can infer discrimination as to the casual seniority list if it finds discrimination with respect to the temporary layoffs. But the two acts involved two different supervisors: Jim LeClaire prepared the seniority list and Ed Urban laid the plaintiffs off. (FOF 12; FOF 18, fn. 20.) Even if Urban is found to have discriminated against the plaintiffs, this does not mean that LeClaire did too. If it did, what inference is the Court to draw from Finkelmeyer's efforts to attract more minority workers and prevent racial incidents in the workplace? (Godfrey's Post Trial Memorandum at 3–6; TT., Vol. 2 at 218–25.) To take it even further, what inference is the Court to draw from the fact that LeClaire was the guy who retained the plaintiffs in the first place? If Urban's actions make it more likely that LeClaire discriminated against the plaintiffs, Finkelmeyer and LeClaire's actions make it more likely that he did not. *See e.g., Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991) ("... in cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor ...").

■ 17. In short, the Court is left with an inconclusive statistical case and a weak non-statistical case for race discrimination. Under those circumstances, the plaintiffs have not met their burden of proof.[29]

### 3. "But-for" causation.

■ 18. Even if the plaintiffs met their burden of proof they could not recover. "It is well settled in this circuit that the ultimate inquiry in a Title VII disparate treatment claim is whether a discriminatory intent was a 'but for' cause of the adverse action." *McQuillen v. Wisconsin Educ. Ass'n Council*, 830 F.2d 659, 664 (7th Cir.1987). "Under this 'but for' standard of causation it is not enough for an employee to show that an employer harbored some discriminatory motivation. Rather, the employee must establish that the discriminatory motivation was a determining factor in the challenged employment decision in that the employee would have received the job absent the discriminatory motivation." *Id.* "As in any tort case, statutory or otherwise, a plaintiff cannot win a discrimination case if the harm to him would have been the same whether or not the defendant had discriminated." *Washington v. Electrical Joint Apprenticeship & Training Committee*, 845 F.2d 710, 712 (7th Cir. 1988).

19. Thus, plaintiffs cannot recover unless they can show that LeClaire's alleged discrimination was a "but for" cause of their low placement on the list. They cannot. There are at least two "causes" for plaintiffs' respective positions on the list. The first is the grouping of virtually all the black casuals into the bottom half of the list. We will assume for purposes of argument that this

---

**29.** While rejecting plaintiffs' arguments for a finding of discrimination, the Court also rejects one of Godfrey's principal arguments against a finding of discrimination. Godfrey argues that LeClaire could not have possibly intended to discriminate against the plaintiffs, because he prepared the seniority list before the Union formally requested it and therefore before he could have known of the significance of the list's order. (Godfrey Post Trial Memorandum at 17–21.) While the Court agrees that the list was prepared before the Union requested one (FOF 14, fn. 11), it is also clear that Barth told LeClaire the significance of the order of the list as early as August, 1985. (FOF 12, fn. 8.) The significance was also made known in the new labor contract, which was dated August 11, 1985 and signed August 18, 1985. (Ex. 200.) Thus, LeClaire was aware of the significance of the order when he prepared the list and could have formed the requisite intent to discriminate against the plaintiffs.

grouping was intentional and motivated by race discrimination. The second is the ordering of the black and other minority casuals vis-a-vis each other. This was randomly determined. If you remove the first cause, these plaintiffs are still the last three black casuals on the list and three of the last four minorities on the list. (FOF 13.) There is no basis under Title VII for changing this unhappy fact. Obviously, even under a non-discriminatory, perfectly random listing of names, there are going to be some black casuals near the bottom of the list. Plaintiffs happen to be those black casuals. The point can be demonstrated easily enough by determining where the plaintiffs would fall on a purely random list that still preserves (as we must) their positions vis-a-vis the other minority and/or black casuals. Of the 35 original casuals, 11 were minorities. (Ex. 204.) In a purely random distribution, you would expect to find one minority for every 3.18 names. Thus Wright, as the last minority on the list, would remain in 34th position. Harper, the second-to-last minority, would actually drop from 29th to 30th. And Webber, the fourth-to-last minority, would remain 25th. The results are even worse if we analyze it according to the placement of blacks vs. non-blacks. Of the 35 original casuals, 8 were black. (Ex. 204.) In a purely random distribution, you would expect to find one black casual for every 4.375 names. Under that scenario, as the last black on the list, Wright would drop from 34th to 35th position. Harper, the second-to-last black casual, would drop from 29th to 30th. And Webber, the third-to-last black casual, would drop from 25th to 26th. In any of the foregoing positions, the plaintiffs would have been terminated prior to becoming regular employ-

ees. (Ex. 204.) Race discrimination, even if it existed, was therefore not a "but for" cause of plaintiffs' respective positions on the list and/or their failure to become regular employees.[30]

20. One objection to this reasoning might be that it is arbitrary and unfair. It effectively states that some of the black casuals had a case for racial discrimination (those higher up on the list) but these plaintiffs did not. Why should this be, when LeClaire's discriminatory intention extended (if at all) to all of the black casuals as a group? The answer is simple. Title VII is a remedial statute intended to restore victims of discrimination to the position they would have been in absent the alleged discrimination, but no further. It was not intended to place them in a better position, yet that is what would happen if the plaintiffs recovered here. Thus, if the result is arbitrary, it is only because the plaintiffs' positions vis-a-vis the other black and minority casuals was arbitrary. That is something Title VII does not speak to.[31] Title VII remedies the consequences of discrimination in the workplace. It does not remedy the arbitrary forces of chance.

## C. Disparate Impact

21. Since the Supreme Court's landmark decision in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), it has been clear that "employment procedures that result in unequal representation are not saved by an employer's 'good intentions or absence of discriminatory intent.'" *Van v. Plant & Field Service Corp.*, 672 F.Supp. 1306, 1312 (C.D.Cal.1987), quoting *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854. "It

---

**30.** The results are the same even if we assume there were only 34 original casuals, as plaintiffs argued. Under that scenario, we would expect to see one minority casual for every 3.09 names, which would keep Wright in the 34th position, drop Harper to 31st, and improve Webber only slightly to 24th position. Alternatively, we would expect to see one black casual for every 4.25 names, in which case all three plaintiffs would remain in the same position as they were originally.

**31.** Plaintiffs could argue that their position vis-a-vis the non-black (NB) casuals was discriminatory, because even though there were only three

non-blacks, two of them (an hispanic and an oriental) were the first two minorities on the list. In a purely random ordering, you would not expect to see this. You would expect to see a non-black minority casual for every 3.66 minorities, which results in the following order: B, B, NB, B, B, B, NB, B, B, NB, B. But even under such a random ordering the plaintiffs, as the last three blacks on the list, would be 25th, 28th and 34th (out of 35 casuals), or 24th, 27th and 34th (out of 34 casuals). In any of these positions, the plaintiffs would have been terminated before they became regular employees.

is the inequality itself that raises an inference of discrimination." *Id.* "To establish a claim of racial discrimination on the basis of disparate impact, the claimant must prove (1) an identifiable, facially neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two." *Pierce v. Marsh,* 859 F.2d 601, 604 (8th Cir.1988). Judged by these requirements, the claim must fail.

### 1. Facially neutral policy.

■■■ 22. Plaintiffs have the burden of "isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *McConnell v. Noranda Aluminum, Inc.,* 735 F.Supp. 929, 934 (E.D.Mo.1990). Their attempts at doing so have been somewhat vague. At different points in their post-trial briefing they have argued that the policy or practice at issue was (1) the simple act of composing the casual seniority list, *i.e.,* "this Court should find that the composition of the casual seniority list, even if assumed to be a facially neutral procedure imposed a disparate impact on the class of blacks including the plaintiffs" (Plaintiffs' Closing Argument at 12); and/or (2) the ordering of that list based on the subjective evaluations of each casual's respective abilities. (Plaintiffs' Reply at 17–18.)

23. The second policy or practice is clearly meritless. Godfrey has not posited such an ordering as a possibility. (FOF 14, fn. 10.) Even the plaintiffs acknowledged that such an ordering was at best only a "possibility" raised by LeClaire in his deposition and one not to be accepted by the Court. (Id.) The record simply does not support the existence of such a policy or practice.

■■■ 24. As for the first policy or practice, the simple composition of a casual seniority list cannot be called a "policy or practice" for disparate impact purposes. The preparation of the list "was a single decision; it was not a policy or practice." *Beard v. Whitley County REMC,* 656 F.Supp. 1461, 1469 (N.D.Ind.1987). "[S]imply labelling an employer's action a 'policy' or 'practice' is not sufficient. The substance of the employer's actions is what determines

whether there is a policy or practice." *Id.* at 1468 (citations omitted). "The plaintiffs cannot simply attack the unfavorable impact of any decision made by the defendant." *Id.* at 1469. Alternatively, the alleged "policy" of composing a casual seniority list cannot be said to "cause" a disparate impact. It is not the mere decision to have a seniority list that causes an alleged disparity, it is the manner in which the list is prepared. The parties have only raised three possible "policies" concerning the "manner" in which the list was prepared. One, that it was prepared according to merit, which the Court and the parties reject. Two, that it was prepared according to race, in which case the "policy" is not facially neutral and therefore can only be the subject of a disparate treatment claim. *See Scott v. Houston,* 613 F.Supp. 34, 37–8 (S.D.Tex.1985) ("alleged practice ... of manipulating promotions from known, existing eligibility lists is not within the category of facially neutral procedures to which the disparate impact model can be applied"). Or three, that it was prepared randomly. As to the third "policy", it is clearly facially neutral, and there may be a disparate impact, but where is the causation? As in any random process, there is always the possibility—indeed, the inevitability, if repeated often enough—that statistically rare or unlikely results will occur. These include the possibility that all of the blacks, or all of the whites, will be in or near the bottom of the list. When these statistically rare results occur, they do not give rise to a disparate impact claim. "The policy or practice contemplated by disparate impact doctrine consists of 'more than the mere occurrence of isolated or accidental or sporadic discriminatory acts', having reference instead to an employer's 'standard operating procedure—the regular rather than the unusual practice.'" *Wright v. National Archives & Records Service,* 609 F.2d 702, 712 (4th Cir.1979). As such, disparate impact claims are "attacks on the *systemic* results of employment practices." *Segar,* 738 F.2d at 1267. Systemically, a random selection procedure evens out; there is nothing inherent in the procedure that systemically hinders the advancement of black employees.

## 2. Disparate effect.

25. Not just any disparate effect will give rise to a claim of disparate impact. Rather, "statistical disparities must be sufficiently substantial" and not of "limited magnitude." *Waisome,* 948 F.2d at 1375–76; *McConnell,* 735 F.Supp. at 934. "Small or incomplete data sets, and inadequate statistical techniques, are common weaknesses that may be found in such evidence." *McConnell,* 735 F.Supp. at 934. Of course, "[t]here is no minimum statistical threshold requiring a mandatory finding that a plaintiff has demonstrated a violation of Title VII. Courts should take a 'case-by-case approach' in judging the significance or substantiality of disparities, one that considers not only statistics but also all the surrounding facts and circumstances." *Waisome,* 948 F.2d at 1376. Here, the Court has already noted possible variations of plaintiffs' statistical analyses that call into question the statistical significance of those analyses. (COL 10–13.) More importantly, even if we agree with plaintiffs' conclusion that the disparities at issue are "statistically significant", we must nonetheless consider whether the disparity is "of limited magnitude" given the relatively small data set of 35 casual employees. In such small data sets, statistically significant results can often become statistically insignificant simply by adjusting one or two units of data. That is the situation here. As Dr. Stebbins himself admitted, if you exchanged the names of only two black casuals in the bottom half of the list with the names of two white casuals in the top half of the list, the resulting disparity may no longer be statistically significant. (TT., Vol. 2 at 39–40.) It was for this very reason that the *Waisome* court, when considering a disparity in promotions allegedly caused by the use of a written test requirement, rejected the disparity as insubstantial despite the fact that it was found to be statistically significant:

> Applying these principles, we believe Judge Duffy correctly held there was not a substantial disparity in the rates at which black and white candidates passed the written examination. . . . though the disparity was found to be statistically significant, it was of limited magnitude, as the district court demonstrated by positing

that if two additional black candidates passed the written examination the disparity would no longer be of statistical importance. *See* 44 Fed.Reg. 11996, 11999 (March 2, 1979) (approving use of hypothetical alterations in results of challenged employment practices to determine whether disparity was too small to find an illegal disparate impact).

*Waisome,* 948 F.2d at 1376.

## 3. Causation.

26. Plaintiffs also fail to prove causation with the specificity required in disparate impact cases. It is not enough for the plaintiffs to show that the policy or practice at issue caused a disparate impact upon the protected class of black casuals as a whole. Rather, plaintiffs must go further and show that the plaintiffs themselves were injured by the policy:

> [w]here the disparate impact doctrine has been used by the courts in individual actions rather than class actions, a plaintiff has been required to show that he personally has been the victim of discrimination by the general practice which allegedly resulted in a discriminatory impact on a protected group. It is not sufficient for an individual plaintiff to show that the employer followed a discriminatory policy without also showing that plaintiff himself was injured.

*Robinson v. Polaroid Corp.,* 732 F.2d 1010, 1016 (1st Cir.1984), quoting *Coe v. Yellow Freight System, Inc.,* 646 F.2d 444, 451 (10th Cir.1981). Here, as was demonstrated earlier, plaintiffs have not been harmed. They are in virtually the same position they would have been in regardless of how the list was prepared. (COL 19.) Therefore, their claims cannot stand.

## II. PLAINTIFFS' LAYOFF CLAIMS

27. Plaintiffs' layoff claims are based solely upon the disparate treatment theory of liability. Based on the Court's previous factual findings, the substance of the claim is that Godfrey deliberately neglected to call plaintiffs for work and instead hired new white casuals to perform their jobs. (FOF 19.) Godfrey argues that the

plaintiffs simply were not available when called. Again, because the matter has gone to trial, the Court need not analyze or decide the issue within the evidentiary framework of prima facie cases, non-discriminatory explanations and shifting burdens of proof and production. (COL 7.)

28. The plaintiffs were available and willing to work during the "layoff" period. The only direct evidence supports this conclusion. The plaintiffs so testified. No one from Godfrey testified otherwise. (FOF 19.) No documents from Godfrey indicated otherwise. (Id.) Godfrey could not provide any dates as to when they allegedly called the plaintiffs during this period and they were not available. (Id.)

29. Circumstantial evidence also suggests the plaintiffs were available for work. Critical here are plaintiffs' work records prior to and immediately after the "layoff". When the Teamsters went on strike, all three plaintiffs seized the opportunity to work. (FOF 5–6.) Despite intense violence, hostility and harassment from the striking workers, the plaintiffs kept working throughout the strike. (FOF 7–8.) Plaintiffs were apparently hardworking and reliable during the strike, because Godfrey asked all three to stay on as casuals. (FOF 9.) When asked to stay on, plaintiffs again seized the opportunity to work. Harper never missed a week of work prior to the "layoff" and always averaged more than 30 hours a week.[32] (FOF 16.) Webber's hours, with the exception of his incarceration, were almost as high as Harper's. (Id.) And even though Wright's hours were lower and more erratic than Harper and Webber's, they were not insubstantial and they were never non-existent prior to the "layoff". (Id.) Even Godfrey admits, as it must, that all three plaintiffs worked at

least the average number of hours for a casual employee both prior to and after the "layoff" period.[33] (Godfrey's Post Trial Memorandum at 7–8.) Why then would the plaintiffs suddenly and deliberately become unaccountably and absolutely unavailable for a limited period of time in the dead of winter?

30. The fact that state unemployment compensation tribunals found that the plaintiffs were unavailable for work during a similar slowdown in 1987 is just that, evidence of their unavailability in 1987. Those decisions were based on evidence of specific dates upon which the plaintiffs were called and found unavailable for work. (FOF 10, 19.) No such evidence was submitted for the slowdown in 1986. (FOF 19.) Indeed, the 1987 incidents led to plaintiffs' dismissals. (Id.) If plaintiffs were unaccountably unavailable in 1986, why were they not dismissed as two other black casuals had been prior to the layoff for that very reason. (Ex. 204 at lines 18 & 19.) Moreover, as to Wright, the 1987 records do not show him to be *completely* unavailable for work. Rather, even during the slowdown of 1987, the records show that Wright was available for some hours. (Ex. 27.) Moreover, the fact that plaintiffs waited almost a month before coming back to work after the "layoff" period is not strong evidence that they worked when and if they felt like it. (FOF 19.) The Court must consider such evidence in light of their prior work histories which show that the plaintiffs worked whenever they could, at least for the year 1986. The delay is perhaps better explained by the plaintiffs' testimony that they waited because their EEOC charges were pending and they wished to consult their attorney before returning.[34] (TT., Vol. 1 at 41–42, 104, 154.)

---

32. With the exception of averaging 22.5 hours in February, 1986, a period of time when Godfrey admits there was a decreased need for casuals. (FOF 16.)

33. Godfrey argues that this fact actually militates against a finding of discrimination. Godfrey argues that it is illogical to conclude that the company would discriminate against the plaintiffs for an isolated 12–week period. (Godfrey's Post Trial Memorandum at 7–8.) Not really. Plaintiffs do not argue that Godfrey as a company con-

spired to discriminate against them; they argue that Ed Urban, either by himself or in concert with other warehouse supervisors, conspired to do so. The evidence supports this conclusion. But when the plaintiffs filed EEOC charges shortly thereafter, it was Godfrey as a company that had to respond. That response was apparently to offer the plaintiffs work. (Exs. 10–12.)

34. This does not mean, however, that the plaintiffs are entitled to damages during this delay. Rather, plaintiffs damages, if any, should be off-

31. The plaintiffs were not called in for work because of their race. Prior to the "layoff", white casuals averaged 32–40 hours a week, while Harper and Webber averaged 18–37. (FOF 18.) After the "layoff", white casuals still averaged 32–40 hours, while the plaintiffs received no hours. (Id.) After they were "laid-off", plaintiffs returned to Godfrey and saw new white casuals performing their jobs. (Id.) In fact, five white casuals were hired during the "layoff" period. (Id.) Three of the new white casuals averaged full-time hours during the "layoff" and the 28 casuals who worked more than two weeks during that period (all but two of whom were white) averaged almost 38 hours. (Id.) Plaintiffs averaged zero hours. (Id.)

32. This is not to say that the Court reaches the foregoing conclusions free of doubt. Wright's demeanor on the stand and plaintiffs' unavailability during a similar slowdown in 1987 has given the Court reason to pause. Plaintiffs' burden, however, is to prove their case by a mere preponderance of the evidence, which is to say that they must establish their position through the greater weight of the credible evidence.[35] The Court must therefore base its decision on the record before it. Plaintiffs have come forward with compelling evidence that race was a determining factor in who was "laid-off" and who was not. (COL 31.) Godfrey, on the other hand, failed to submit any direct evidence of plaintiffs' alleged unavailability and failed to posit a satisfactory explanation for why the plaintiffs would suddenly become unavailable. (COL 28–30.) On this record, the greater weight of the credible evidence favors the plaintiffs.

33. The Court also wishes to make clear that it does not hereby find that Godfrey discriminates against minorities in general. Indeed, the plaintiffs do not even posit such a conclusion. What the record shows is that Ed Urban (a former Godfrey supervisor eventually fired for theft), either alone or in concert with other supervisors, discriminated against the plaintiffs by manipulating which casuals were provided work. There is no dispute that deciding which casuals would get work and how was within Urban's apparent authority and control as a supervisor. As such, Godfrey is strictly liable for Urban's actions. *North v. Madison Area Asso. for Retarded Citizens–Developmental Centers Corp.,* 844 F.2d 401, 407 (7th Cir.1988). That is unfortunate, for the record also shows that Godfrey has a racially balanced work force overall and affirmatively seeks and recruits qualified minorities for positions with the company. (Godfrey's Post Trial Memorandum at 3–6; TT., Vol. 2 at 218–25.) But the disparate treatment remedy under Title VII is intended "to provide an equal opportunity for *each* applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force." *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 579, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978). "A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination." *Id.* at 579, 98 S.Ct. at 2950–51.

34. Plaintiffs made $9.25 an hour prior to the layoff. (FOF 16.) Plaintiffs missed twelve weeks of work during the layoff. (FOF 18.) Four of those weeks were due to their own delay in returning, however, and they will not be compensated for that delay. (FOF 19; COL 30, fn. 34.) During the remaining eight weeks, the average hours for working casuals (*i.e.,* casuals working more than two weeks) was 38 hours per week. (FOF 18.) 38 hours × $9.25 an hour = a weekly wage of $351.50. $351.50 × 8 weeks = $2812.00 backpay for each plaintiff.

35. Title VII states that "[i]nterim earnings or amounts earnable with reasonable diligence by the person ... discriminated against shall operate to reduce the backpay otherwise allowable." 42 U.S.C. § 2000e–5(g). It is within the Court's discretion to treat unemployment compensation benefits as "interim earnings" which must be offset against plaintiffs' backpay awards, and

---

set by the wage value of the weekly hours worked by the average casual during this period.

**35.** *Caro v. Schultz,* 521 F.2d 1084, 1089 (7th Cir.1975); *Florence v. Frank,* 774 F.Supp. 1054, 1059 (N.D.Tex.1991); *Payne v. Ford Motor Co.,* 385 F.Supp. 1079, 1083 (D.C.Mo.1974).

it will do so here. Harper received $2,014.00 in unemployment compensation in 1986. (TT., Vol. 1 at 68–70.) This reduces his backpay award to $798.00. Webber received $2,158.00 in unemployment compensation in 1986. (TT., Vol. 1 at 167.) This reduces his backpay award to $654.00. There was no evidence introduced at trial regarding whether Wright received any unemployment compensation benefits in 1986 (Godfrey's Post Trial Memorandum at 22.) and thus his backpay award remains at $2812.00.

■ 36. Plaintiffs ask for compounded prejudgment interest at an annual rate of 7%. (Plaintiffs' Closing Argument at 20–21.) Godfrey has not voiced an objection to the same. "Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers." *United States EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 819 (7th Cir.1990). "Indeed, the Supreme Court has said that it is a 'normal incident' of relief in Title VII suits.". *Id.* The matter is left to the Court's discretion and "turns upon whether the amount of damages is easily ascertainable." *Id.* at 821, quoting *Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402, 411 (7th Cir.1989). Here, the amount of backpay is easily ascertainable (COL 34) and prejudgment interest will be awarded.

■ 37. The rate of prejudgment interest and whether it should be compounded are questions left to the Court's discretion. *E.E.O.C. v. O'Grady*, 857 F.2d 383, 391–92 (7th Cir.1988); *Gurnee*, 914 F.2d at 820, fn. 8. Plaintiffs suggest a 7% rate compounded annually based upon the 52 Week T–Bill rate during the months of March and April, 1986 (7.06% and 6.31%, respectively). (Plaintiffs' Closing Argument at 20–21, Ex. B.) This appears reasonable and Godfrey does not offer a different rate. The rate is applied over a period of 7 years and 245 days (March 10, 1986 through November 10, 1993). This increases Harper's total award to $1341.62, Webber's total award to $1099.52, and Wright's total award to $4727.63. The combined total award against Godfrey is therefore $7168.77.

**SO ORDERED.**

## APPENDIX

I.

Q: Okay. What is your—For whom do you work?

A: Work for the Godfrey Company.

Q: And what is your position?

A: Warehouse operations manager.

Q: How long have you had that position?

A: Just a year.

Q: What did you do before that?

A: Was a warehouse supervisor.

Q: And for what company?

A: Godfrey Company.

Q: How long have you worked for the Godfrey Company?

A: Started November of 1981.

(LeClaire Dep. at 4–5.)

II.

A: I was first shift supervisor.

Q: Okay. Who was the second shift supervisor?

A: Ed Urban.

Q: And who—was there a third shift?

A: At that time no, there wasn't.

(LeClaire Dep. at 6.)

III.

Q: Do you know anything about the circumstances under which Mr. Wright was not working or didn't get hours at D.G. Barcom during the period of March and April of 1986?

A: The circumstances I'm not sure of. The procedure was for a casual to call in on a daily basis.

Q: You don't have any personal knowledge about whether Mr. Wright was or was not following the procedure, do you?

A: No, I don't.

(LeClaire Dep. at 27.)

IV.

Q: Okay. Do you know the circumstances under which Mr. Webber was not working any hours during March and April of 1986 except for the general procedure?

A: The only reason there wouldn't be any hours is because, first of all, it would be the lack of people off. They were on an on-call basis.

Q: Well, I want to know if you know for a fact what happened to Mr. Webber. Again, let's not—I don't play games. What Mr. Webber says is he had a conversation with his shift supervisor and he was told he was laid off. As I understand the company's position, it may be that he wasn't available, couldn't be called.

What I want to find out is do you know something about that yourself other than what you've been told? Were you a participant in the situation so that you knew something about it? Do you know something about that?

A: I wasn't a participant on a daily basis.

Q: Okay.

A: Again it depends on the period of time.

Q: Well, I'm talking about the time period of March and April. I think the company records show zero hours for Mr. Webber during that time period, and I want to know if you know what had happened.

A: No, I do not.

Q: Okay. I have the same question about Mr. Harper. Do you know why it was he had zero hours in March and April, 1986?

A: No, I do not.

(LeClaire Dep. at 28–29.)

V.

Q: Okay. Are you familiar with something called the casual seniority list?

A: Yes, I am.

Q: What is that?

A: That is a list of casuals that work for the D.G. Barcom Company.

Q: And what is the purpose of the list?

A: The purpose of having a casual seniority list is, if anyone is promoted to full time, they would be hired in that order.

Q: In the order that they appear on the list; is that true?

A: Yes.

Q: When was the first casual seniority list established if you know?

A: The first list was established—It was the end of 1985.

Q: How close to the end? Was it December, November, October?

A: November.

Q: Did you have anything to do with the establishment of the first casual seniority list?

A: Yes, I did.

Q: And what was your role in the establishment of the first casual seniority list?

A: My role was to organize the list on who we would keep. At that period of time the union did not request a seniority list. The union requested a seniority list at that time of casuals in November.

Q: Okay. The union asked for the list, and then you got the job of organizing the list; is that true? Is that what happened?

A: I don't know if I organized it. I asked other supervisors questions on—That wasn't in November. I mean—Let me explain myself.

Q: Okay.

A: In August we were asked to keep casuals, so we went to the supervisors, we kept casuals. The union did not request it till November, the seniority list.

Q: Okay.

A: And what we did is we kept the same guys on that list, and that's when it was established.

Q: But how did you become involved in it? Did someone ask you—Strike that. Did you actually prepare the list yourself, the first list?

A: No. I asked the other supervisors for input on what casuals we would keep, you know.

Q: All right.

A: And what departments they worked in and what our work load called for.

MR. PRENTISS: I'll just remind you that—I don't want to preempt you, but there's confusion here. There's a decision process of who do we keep and the process of whose name in which sequence on the list. Just keep that in mind.

MR. ROGERS: I'll get to that and try to clarify this.

Q: I'm talking at some point somebody determined an order on the list; is that true?

A: Yes.

Q: Who did that?

A: I wrote the list up.

Q: Okay. You made the determination what order they would be in based on input from others; is that fair to say?

A: Yes.

Q: Okay. But you made the determination based on this input. You're the one that—Somebody had to write down the order and that was you; is that true?

A: Yes.

Q: Okay.

(LeClaire Dep. at 29–32.)

VI.

Q: Now this particular list, and again I want to refer you particularly to page two, the order on which those names appear, was that a determination made by you based on input from others?

A: I guess I'm confused with determination. I wrote the list up, I had the input from others. Did I determine who or why they were put in this order?

Q: Yes.

A: I don't know for whatever reason why they were put in this order.

Q: You do not know why they were put in this order?

A: No, I do not. Outside of ability and jobs they could perform, that's what we based it on.

Q: Now when you say we, who are you referring to?

A: Other supervisors.

Q: Namely who?

A: Second shift supervisors, Ed Urban, Scott Godfrey, Jim Mages.

Q: Was there—I want you to think about the time that you put together the first casual seniority list. Was this input that you got from the other supervisors about the employees, was that at a meeting that you held, particular meeting, or was this more of an ongoing process?

A: It was, I guess, a meeting with the different—with second shift and first shift. I don't recall a meeting as with everyone sitting down, but it could be giving me your input on people.

Q: Okay. How did you get this job of putting together the list? Did someone give it to you?

A: I recall Doug Barth asking me to find out what casuals we would keep. At the time we were told we were going to keep casuals of people that worked during the strike.

Q: Did he say to prepare a list in order?

A: I don't recall that.

Q: How did you know to prepare it in some sort of order?

A: Common sense. I mean if—

Q: Okay.

A: I don't know if it was determined keep X amount of casuals or what, but we knew we were supposed to have casuals.

Q: I'm concerned—I know there was a determination made of who to keep and who not to keep, but I'm concerned about the decision when you decided on those that you were going to keep, what order to put them in the list. That's what I'm asking you about.

So there wasn't a single meeting with all the supervisors from whom you got input; is that fair to say? There wasn't a single meeting?

A: I think it was done by shifts.

Q: All right. Meeting by shifts, in other words?

A: First shift, second shift supervisors.

Q: So was there just one meeting with each shift before this list was prepared, Exhibit 1?

A: To my recollection there was a meeting with first shift supervisors and a meeting with second shift supervisors. (LeClaire Dep. at 35–38.)

VII.

Q: Okay. When you sat down and had the meeting with the first shift supervisors, did you have a list of employees with you?

A: Not to my knowledge I didn't.

Q: How did you discuss—Did you discuss individual employees with the first shift supervisors by name?

A: No, I did not.

Q: How did you get input? What kind of input did you get from the first shift supervisors about the employees, the casual employees?

A: When we found that we would be keeping some of the people that worked during the strike, we went to the different areas and different departments and asked for input for people that they would keep, who were the better workers in your area, who knows how to do what jobs.

Q: And did you get names then?

A: Yes.

Q: Did you write the names down?

A: That's I believe to my recollection how we established this list.

Q: Okay. Did the supervisors tell you more than just who to keep? Did they give you any information as to what information you needed to put them in a particular order?

A: As far as the order goes, I do not recall how the order was established.

Q: You don't know how it was established?

A: Not in reference to your question.

Q: Did a supervisor's opinion about how good one employee was versus another have anything to do with where that employee would appear on the list?

A: We looked at ability and the jobs the employee could do. We also had a mechanical pick car system which we needed people who knew how to run that. I know we kept some of those people. We looked if people knew how to work on the grocery floor, in the cooler, in the freezer. We also looked if people had any fork experience. At that time it was uncertain on where these casuals would fall in the workplace. It was kind of a helter-skelter type thing on doing this.

Q: Would it be fair to say, if I understood your answer correctly, that one of the things you look for is what work experience they have, what jobs the individuals had done?

A: While they were with us—

Q: Yes.

A: —when they worked during the strike.

Q: Right. That had something to do with the order on which they were placed on this list. Is that what you're telling me or not?

MR. PRENTISS: I object to that characterization. I don't think that's what he said.

MR. ROGERS: I'm asking him because I'm uncertain if I understood him or not.

THE WITNESS:

A: I'm not certain on if it was done that way, on what jobs they did, on how we put the names on the list. I do not recall that.

Q: Can you tell me, and again I'm only concerned with the order on the list as opposed to the decision whether to keep the casual employer or not, in terms of the order on the list, what was it that determined that order?

MR. PRENTISS: Objection. Asked and answered. Go ahead and try it again.

THE WITNESS:

A: I am still uncertain on how the list— why it was in this order.

MR. ROGERS:

Q: You don't know why it was in that order, okay. Apart from yourself and the supervisors that you talked to, was anyone else involved in the preparation of the first casual seniority list?

A: Apart from the people that I had mentioned, the other supervisors, I do not recall anyone else being involved.

(LeClaire Dep. at 38–41.)

VIII.

Q: Sure. In fact, I'll give you a running start on what I'm up to. If I've understood your testimony correctly, you're not certain just exactly how it was that employees came to be in the place they were on the casual seniority list.

A: Uh-huh.

Q: So now that you've seen this, I'm trying to find out if it refreshes your memory at all as to whether hourly productivity data had something to do with the order in which people appeared on the list.

A: You're talking two different times. This information wasn't available.

Q: Well, as you can see,—Let's assume for the moment that it starts out in October of 1985, does it not?

A: Yes.

Q: And I think you've told me that the first casual seniority list you believe was prepared sometime in November, 1985; is that right?

A: No. I believe I stated that's when the union requested a seniority list.

Q: Okay.

A: At that time.

Q: Did you have the list already done by then?

A: To my knowledge we had a list done in August, and I Believe I stated that earlier of who we would keep.

MR. PRENTISS: That's not what he's asking about. He's asking about a seniority list, not an about who we would keep list.

WITNESS: Yes.

MR. ROGERS:

Q: Are there two different lists? The who you would keep list, is that different from the casual seniority list, the first one I mean?

A: I'm uncertain if there's two different lists. It could be one and the same list.

Q: Okay. You're just not sure as you sit here today?

A: Right.

Q: Your memory isn't clear?

A: No.

Q: Okay. So that that's why you're telling me that this kind of data wasn't available at the time the first casual seniority list was prepared because you believe that was done sometime in August of 1985, correct?

MR. PRENTISS: Object to the form of that question. Go ahead and answer as best you can.

THE WITNESS:

A: It was not established at that time in August that it was a seniority list.

(LeClaire Dep. at 57–59.)